## STATE OF CONNECTICUT v. SEDRICK COBB
### (14384)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON, NORCOTT and KATZ, Js.

Argued March 15—decision released August 8, 1995

*David S. Golub*, with whom was *Jonathan M. Levine*, in support of the motion.

*Jack W. Fischer*, assistant state's attorney, and *John A. Connelly*, state's attorney, in opposition to the motion.

BORDEN, J. The defendant, Sedrick Cobb, who has appealed from the judgment of conviction of capital felony and from the imposition of the death sentence following that conviction, has moved[1] for enlargement of the class of similar cases that we will consider in determining whether his death sentence is justified in light of the prohibition against disproportionality provided by General Statutes § 53a-46b (b) (3).[2] In his

---

[1] The defendant is represented by two separate sets of attorneys in his appeal. The appellate unit of the office of the chief public defender represents him on everything but the proportionality review aspect of the appeal. Because of possible conflicts of interests with other clients of that office, separate counsel has been appointed to represent the defendant on the proportionality review aspect of the appeal. It is that counsel who presents this motion on the defendant's behalf.

[2] General Statutes § 53a-46b provides: "REVIEW OF DEATH SENTENCE. (a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) *the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.*

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence." (Emphasis added.)

Section 53a-46b was first enacted in 1980. See Public Acts 1980, No. 80-332, codified at General Statutes (Rev. to 1981) § 53a-46b. Minor changes have been enacted since then, none of which affects this case. The legisla-

motion, the defendant requests that we consider "all cases prosecuted in Connecticut after October 1, 1973, in which a capital felony *could have been charged* pursuant to Conn. Gen. Stat. § 53a-46b and which resulted in a homicide conviction, following a plea or trial."[3] (Emphasis added.) The defendant argues that this expanded universe of cases is necessary to enable this court to evaluate his claim that race has an impermissible effect on capital sentencing decisions in Connecticut, rendering the imposition of the death penalty upon him disproportionate under § 53a-46b (b) (3).

The defendant argues in his motion that "because of the fundamental distinction between the death penalty and all other punishments, there is a 'corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' " Further, the defendant argues that "[p]roportionality review is one of the critical measures adopted by the Connecticut legislature to help achieve such reliability."

The defendant accordingly seeks to expand the universe of cases in order to present evidence that the death penalty scheme has been disproportionately applied to black defendants or to defendants whose victims were white.[4] The defendant argues that "the pre-

---

ture recently eliminated proportionality review altogether on a prospective basis. Public Acts 1995, No. 95-16, § 3 (b).

[3] The defendant "seeks permission to include the proposed expanded universe of cases *in his trial* so that the Court may decide both the appropriateness of [the] defendant's proposed expanded universe and the merits of [the] defendant's claim on the basis of a more fully substantiated statistical record." (Emphasis added.) In light of the fact that the defendant's trial has been concluded, we assume that the phrase "in his trial" was intended to be "in his appeal."

[4] According to the defendant, his preliminary data show that: (1) since 1973, prosecutors have charged a capital felony pursuant to General Statutes § 53a-54b in seventy-four cases, of which only eleven, or 15 percent, have involved the murder of a victim who was black, even though 40 percent of all murder victims in the state during that same time period were

liminary evidence of racial . . . disparities in the administration of the death penalty in Connecticut

black; (2) since 1973, although there have been eighteen capital prosecutions for murder committed during the course of kidnapping, none was prosecuted where the victim was black; (3) during the same period, there have been twelve capital prosecutions for murder committed in the course of a sexual assault, and only one involved the murder of a black victim; (4) since 1973, twenty-eight cases have resulted in a conviction of capital felony, by verdict or plea, and eighteen of those twenty-eight have proceeded to a hearing on the imposition of the death penalty. Of the twenty-eight capital felony convictions, only four, or 14 percent, have involved the murder of a victim who was black, and of the eighteen that have gone to a penalty phase hearing, only one, or 5.5 percent, has involved the murder of a black victim; (5) of the sixty-six capital convictions in which the guilt phase has been concluded, twenty-one involved black defendants and forty-five involved nonblack defendants. Of the black defendants, thirteen of twenty-one, or 62 percent, were convicted of capital felonies and fifteen of forty-five, or 33 percent, nonwhite defendants were so convicted. The defendant seeks the opportunity to demonstrate the number of kidnap murders of black victims and the number of sexual assault murders of black victims that were not prosecuted as capital felonies and to demonstrate the disproportionate treatment of those crimes as compared to the treatment of comparable crimes involving white victims.

Four general conventions of statistical analysis, however, may affect the significance of the defendant's preliminary data. First, "any statistical analysis must reasonably account for racially neutral variables which could have produced the effect observed." *McCleskey* v. *Zant*, 580 F. Sup. 338, 350 (N.D. Ga. 1984), aff'd sub nom. *McCleskey* v. *Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). Second, "statistical evidence must show the likelihood of discriminatory treatment by the decision-makers who made the judgments in question." Id. Third, "the underlying data must be shown to be accurate." Id. Fourth, "the results should be statistically significant." Id. Because the defendant's preliminary data have not been subjected to a rigorous statistical analysis to determine the accuracy of the data, to account for the racially neutral variables, and to determine the statistical significance of the data, they demonstrate nothing more than a *possible* correlation.

As we indicate later in this opinion, we express no view on whether the defendant's preliminary data, combined with additional data that may be gathered and subjected to appropriate statistical analysis, will prove what the defendant claims the preliminary data suggest. We point to these statistical conventions, which were noted by the federal District Court in *McCleskey* v. *Zant*, supra, 580 F.Sup. 338, in the context of a similar, albeit constitutional, challenge to Georgia's capital crimes scheme, to underscore the caution with which such raw data must be viewed. Thus, the alarm expressed

presents a genuine risk that *the death penalty scheme in this State is tainted by impermissible considerations.*" (Emphasis added.)

In setting out the defendant's claim, it is useful to make explicit what the defendant does not claim. The defendant does not claim that either the federal or the state constitution requires that the universe of cases for purposes of proportionality review pursuant to § 53a-46b (b) (3) include the class of cases that he seeks to have us include. Thus, we are not faced with a constitutional claim in passing on the defendant's motion.

Moreover, the defendant does not claim that the type of appellate review of a death sentence that he seeks to have us perform could not be conducted pursuant to § 53a-46b (b) (1), which provides for setting aside such a sentence if we were to determine that it "was the product of passion, prejudice or any other arbitrary factor." Indeed, the defendant's proportionality review counsel; see footnote 1; asserts that he brings this motion under § 53a-46b (b) (3) because the defendant's other appellate counsel do not intend to raise such a claim under § 53a-46b (b) (1). The defendant's claim, therefore, is that, independent of the state constitution, federal constitution or § 53a-46b (b) (1), § 53a-46b (b) (3) requires, as a matter of statutory interpretation, that we expand the universe of cases for purposes of proportionality review to include the class of cases that he has identified.

---

by the dissent is premature, because it assumes that the raw data have a degree of statistical significance that has not yet been established.

Moreover, by our references herein to *McCleskey*, we do not intend to suggest that the defendant would be confined to the same course of proof that the habeas corpus petitioner in *McCleskey* chose to present. Our point is simply that the defendant's claim in this motion is essentially based on statistics—his preliminary data, and what he necessarily claims those will ultimately prove—and that, to the extent that the defendant's statutory interpretation claim in this motion resembles the federal constitutional challenge made by McCleskey, some sort of statistical evidence and fact-finding, similar to that presented and undertaken in *McCleskey*, will be necessary.

The state posits four arguments in opposition to the defendant's motion to expand the universe of cases. The state argues that: (1) the defendant's motion is not in compliance with Practice Book § 4066A (b) because it does not "identify the additional case or cases claimed to be similar and set forth . . . the circumstances of the crime and the character and record of the defendant involved"; (2) this court has already rejected, in *State* v. *Ross*, 225 Conn. 559, 561, 624 A.2d 886 (1993) (*Ross I*),[5] a claim nearly identical to that of the defendant in this case, and this court should adhere to that decision; (3) practical considerations militate against granting the defendant's motion because it would require an evidentiary hearing to determine which cases could have been charged as capital felonies, and a hearing to determine the significance of the statistical evidence revealed by such a hearing; and (4) the defendant's motion is based on a legally insufficient federal constitutional claim, and therefore it should be denied.

We conclude that, as a matter of statutory interpretation, proportionality review pursuant to § 53a-46b (b) (3) does not contemplate the type of inquiry that would be necessitated by the defendant's motion. We also conclude that the type of appellate claim presented by the defendant in his motion under § 53a-46b (b) (3) is more appropriately presented under § 53a-46b (b) (1), provided that it is based on a proper, preexisting trial record. Lastly, we conclude that, despite the defendant's failure to raise this claim at trial and, therefore, to have created a proper trial record, he will be permitted to raise it by way of a petition for a writ of habeas corpus

---

[5] In order to avoid confusion with our opinion in *State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, U.S. , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), wherein we upheld Ross' conviction of capital murder, but remanded the case for a new sentencing hearing, we refer to our published opinion on Ross' motion to expand the universe of cases we consider in conducting proportionality review as *Ross I*.

after appeal, if the ultimate disposition of his direct appeal in this case renders his claim still viable.

## I

We first address the state's claim that we should deny the defendant's motion because it does not comply with the requirements of the Practice Book. The state argues that the defendant's motion did not identify the additional cases claimed to be similar and did not set forth the circumstances of the crime and the character and record of the defendant involved as required by Practice Book § 4066A.[6]

We reject this claim. The defendant's motion, by definition, cannot comply with § 4066A. The defendant

---

[6] The class of cases that we will consider with respect to proportionality review is governed by Practice Book § 4066A (b). Exercising its rule-making authority, this court has defined in § 4066A (b) the class of "similar cases" under § 53a-46b (b) (3) as follows: "[BRIEF]—REVIEW OF DEATH SENTENCES PURSUANT TO GENERAL STATUTES § 53a-46b . . . .

"(b) For the purpose of reviewing the issue of disproportionality pursuant to Gen. Stat. § 53a-46b (b) (3), the briefs of the parties shall contain appendices setting forth the circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted and the characters and records of the defendants involved therein so far as these are ascertainable from the transcripts of those trials and hearings on the imposition of the death penalty or may be judicially noticed. *Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed, shall be deemed eligible for consideration as 'similar cases,' unless the court, on application of a party claiming that the resulting pool of eligible cases is inadequate for disproportionality review, shall modify this limitation in a particular case.* Any such application shall identify the additional case or cases claimed to be similar and set forth, in addition to the circumstances of the crime and the character and record of the defendant involved, the provisions of the applicable statutes pertaining to the imposition of the death penalty with citations of pertinent decisions interpreting such provisions.

"Any such application shall be filed within thirty days after the delivery date of the transcript ordered by the appellant, or, if no transcript is required or the transcript has been received by the appellant prior to the filing of the appeal, such application shall be filed within thirty days after filing the appeal." (Emphasis added.)

requests that he be given an opportunity to identify those cases that would be relevant to proportionality review of his death sentence, and to create a record sufficient to support his claim. Although strict adherence to the requirements of § 4066A in this case would defeat the defendant's motion, we decline to rest our decision on those requirements because of the serious nature of the defendant's claim. Thus, notwithstanding its procedural deficiencies, we consider the defendant's motion on its merits.

## II

We next address the state's contention that the defendant's request in this case is virtually identical to the application that was considered and rejected in *Ross I*,[7] and that our decision in *Ross I* controls this

[7] Ross requested that we consider all cases prosecuted in Connecticut after October 1, 1973, in which the state "clearly could have, but did not charge the accused with a capital felony and which resulted in a conviction of not less than Manslaughter in the First Degree . . . following a plea or trial." We denied Ross' application to expand the universe of cases in this manner, but granted his more limited request to add cases in which a capital felony conviction had been obtained but a sentence other than death had been imposed, provided that the record contained sufficient information to undertake a relevant comparison. *Ross I*, supra, 225 Conn. 561. Prior to the order in *Ross I*, we had granted two other enlargements of the proportionality universe. In the first, we permitted the class of similar cases to be enlarged by including two specific cases involving the other noncapital murder convictions of Ross himself. In the second, we granted the state's application to include in the pool the cases of *State* v. *Breton,* Supreme Court Docket No. 13845, *State* v. *Cobb,* Supreme Court Docket No. 14384, and *State* v. *Webb,* Supreme Court Docket No. 14409. Subsequent to the *Ross I* order, in *State* v. *Webb,* Supreme Court Docket No. 14409, we granted the defendant's application to include the case of *State* v. *Paradise,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 49836, in the universe of cases to be considered in Webb's proportionality review, subject to Webb's supplying in his briefs a record of *Paradise* and "information sufficient to enable a relevant comparison" of that case. Finally, in *State* v. *Breton,* supra, we granted the defendant's motion to expand the universe of cases on proportionality review to include *State* v. *Gonzalez,* 206 Conn. 213, 537 A.2d 460 (1988), and *State* v. *Amado,* Superior Court, judicial district of Fairfield, Docket No. CR 93-83508, claimed by the defendant to be similar to his case. Again, the granting was

motion. The defendant counters that our decision in *Ross I* "did not address—and did not foreclose—the claim presented here that expansion of the proportionality universe is necessary to enable the court to assess whether Connecticut's capital punishment scheme is impermissibly influenced by racial considerations." Our review of the *Ross* motion, however, reveals that, in fact, the issue was squarely before this court by virtue of the claims contained in that motion.[8] As a result, our decision in that case impliedly rejected the claim presented here.[9] Nonetheless, because the published opinion did not address directly the claim that racial considerations impermissibly taint the administration of Connecticut's death penalty scheme, we decline to

---

conditioned upon the defendant's filing a supplemental brief with the record of the two new cases and "with sufficient information to enable a relevant comparison to be undertaken." We granted Breton's motion in spite of the fact that, in *Amado*, the prosecution had not sought the death penalty.

[8] In his motion before this court to expand the universe of cases that we consider in conducting proportionality review, Ross contended that "proportionality review is 'a means through which to monitor the imposition of death sentences and thereby to prevent any impermissible discrimination in imposing the death penalty.' [*State* v.] *Ramseur*, [106 N.J. 123, 327, 524 A.2d 188 (1987)]. To the extent that such discrimination originates in prosecutorial decision making, it could not be monitored by this court unless the universe were expanded to include clearly death-eligible cases in which the death penalty had not been sought. See *Tichnell* [v. *State*, 297 Md. 432, 483, 468 A.2d 1 (1983)] (Cole, J., concurring) ('Only with a full range of information about the individual defendants potentially but not ultimately exposed to the death penalty can this Court make a sound proportionality decision and thereby be assured that it has given no quarter to disproportionality based solely on *factors such as race, sex, or wealth*.') Hence, a universe including cases that could have been, but were not prosecuted capitally, is absolutely necessary in order to probe the discriminatory effect of prosecutorial decisions." (Emphasis added.)

[9] Although we do not rest our decision on *Ross I*, we do not dismiss lightly its precedential import. "Stare decisis, although not an end in itself, serves the important function of preserving stability and certainty in the law. Accordingly, a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *Kluttz* v. *Howard*, 228 Conn. 401, 406, 636 A.2d 816 (1994). Our decision to revisit the claim made by Ross is to state expressly what we impliedly ruled in *Ross I*.

rely on our opinion in *Ross I* in resolving the issues presented by the defendant's motion.

## III

### A

We turn, therefore, to the merits of the question presented by the defendant's motion, namely, whether as a matter of statutory construction, § 53a-46b (b) (3) contemplates the universe of cases proposed by the defendant. The merits of the defendant's motion must be viewed in the light cast by the history of the concept of proportionality review within the context of capital punishment jurisprudence. In *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the United States Supreme Court rendered a decision effectively invalidating our capital punishment statute because it provided the sentencing jury with no clear, objective guidelines and virtually unlimited discretion in imposing a death sentence. In 1976, the United States Supreme Court examined several states' revised death penalty statutes. All of these statutes provided for automatic appeal of death sentences. Georgia's statute required the reviewing court, to some extent at least, to determine whether, considering both the crime and the defendant, the sentence was disproportionate to that imposed in similar cases. In some states, such as Florida, the appellate court performed proportionality review despite the absence of a statutory requirement. Others, such as California and Texas, conducted no proportionality review whatsoever. The United States Supreme Court, without explicitly addressing the question of proportionality review, concluded that each of these states' capital punishment schemes was constitutional. See *Jurek* v. *Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Proffitt* v. *Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Gregg* v. *Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

Nonetheless, until 1984, it was generally believed that any capital punishment statute that did not provide for proportionality review was constitutionally vulnerable. Therefore, in 1980, when our legislature enacted § 53a-46b, which for the first time provided for appellate review, including proportionality review, of all death sentences, the then House of Representatives chairman of the legislature's Judiciary Committee described the proposed bill as "clarify[ing] our existing death penalty law without any expansion of it or retraction from it . . . . It also mandates that there be an automatic review by the Connecticut Supreme Court in order to affirm any death sentence which may be imposed on anybody. *Most of those standards we feel would put the existing statutes within compliance with the United States Constitutional standards.*" (Emphasis added.) 23 H.R. Proc., Pt. 9, 1980 Sess., p. 2768, remarks of Representative Richard D. Tulisano.

Thereafter, in 1984, the United States Supreme Court explicitly concluded that "[t]here is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it. Indeed, to so hold would effectively overrule *Jurek* and would substantially depart from the sense of *Gregg* and *Proffitt*. We are not persuaded that the Eighth Amendment requires us to take that course." *Pulley* v. *Harris*, 465 U.S. 37, 50–51, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984).

B

Although proportionality review is not constitutionally required, the statutory requirement to conduct such review remains applicable to the defendant's case.[10]

---

[10] Although the legislature recently repealed the proportionality review requirement; see footnote 2; such review is still mandatory for all capital felony cases pending at the time that the repealing statute became effective.

The defendant's motion presents a question of statutory interpretation. "It is axiomatic that the process of statutory interpretation involves a reasoned search for the intention of the legislature. *In re Valerie D.*, 223 Conn. 492, 512, 613 A.2d 748 (1992); *Lauer* v. *Zoning Commission*, 220 Conn. 455, 459–60, 600 A.2d 310 (1991). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Ambroise* v. *William Raveis Real Estate, Inc.*, [226 Conn. 757, 764, 628 A.2d 1303 (1993)]; see *Glastonbury Volunteer Ambulance Assn., Inc.* v. *Freedom of Information Commission*, 227 Conn. 848, 852–57, 633 A.2d 305 (1993). . . . *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994); *Fleming* v. *Garnett*, 231 Conn. 77, 91, 646 A.2d 1308 (1994)." (Citations omitted; internal quotation marks omitted.) *Frillici* v. *Westport*, 231 Conn. 418, 431–32, 650 A.2d 557 (1994).

The question before us, therefore, is whether the legislature intended to include the defendant's requested expanded universe of cases in our determination of whether the defendant's "sentence is excessive or disproportionate to the penalty imposed in similar cases." General Statutes § 53a-46b (b) (3). In light of the language of the statute, its legislative history, and the historical and jurisprudential context in which it was enacted, we conclude that the legislature did not intend proportionality review to encompass a comparison with all homicide cases prosecuted since 1973 in which a capital felony could have been charged.

We begin our analysis with the language of § 53a-46b (b) (3). This section provides that the sentence of death shall be affirmed unless "the sentence is excessive or

disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." Although the statute does not define what the legislature intended to be included as "similar cases" for comparison purposes, the language used strongly suggests an individualized process of comparison among cases in which the defendant has been convicted of a capital felony and in which the sentencer either has or has not imposed the death penalty. The statute contemplates a process of comparing the circumstances of one particular crime and the character and record of one particular defendant with the particular circumstances of other particular crimes committed by other particular defendants. The phrases "similar cases," "circumstances of the crime," and "character and record of the defendant" are strongly suggestive of a process of particularized comparison. As we stated in *Ross I*, supra, 225 Conn. 562–63, "[u]nder the express provisions of General Statutes §§ 53a-35a and 53a-46a, only conviction of a capital felony . . . occasions a hearing into mitigating and aggravating factors to determine whether the death penalty should be imposed. Only conviction of a capital felony will put on the record the circumstances that are relevant to the proportionality review mandated by § 53a-46b (b) (3)."

The language of § 53a-46b (b) (3) is consistent, therefore, with a particularized case-by-case comparison of the defendant's sentence of death with those other cases in which other defendants were convicted of capital felonies. The language is inconsistent, however, with a comparison of the entire decision-making process engaged in by all the relevant actors in all homicide cases prosecuted since 1973.

The legislative history of § 53a-46b (b) (3), moreover, supports the conclusion that the statute does not contemplate the kind of universe advocated by the

defendant, which would necessarily be accompanied by detailed, complex fact-finding. See, e.g., *McCleskey* v. *Zant*, 580 F. Sup. 338 (N.D. Ga. 1984), aff'd sub nom. *McCleskey* v. *Kemp,* 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).[11] Proportionality review, as required by § 53a-46b (b) (3), was enacted in 1980 as part of Public Acts 1980, No. 80-332, which addressed the entire issue of appellate review of death sentences.[12] The sparse legislative history attending Public Acts 1980, No. 80-332, did not mention proportionality review explicitly, and indicated only that "[m]ost of those standards [of appellate review of death sentences] we feel would put the existing statutes within compliance with the United States Constitutional standards." 23 H.R. Proc., Pt. 7, 1980 Sess., p. 2768, remarks of Representative Richard D. Tulisano. The absence from this history of any legislative indication of an intent to require the *McCleskey* kind of extraordinary fact-

---

[11] In *McCleskey* v. *Zant,* supra, 580 F. Sup. 338, the United States District Court held a full evidentiary hearing to determine the validity of the statistical evidence of impermissible racial considerations in the imposition of the death penalty presented by the defendant. The opinion of the District Court demonstrates the parameters of the kind of factual inquiry that would likely be necessitated by granting the defendant's motion in this case.

[12] Number 80-332 of the 1980 Public Acts provided: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a . . . shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a class A felony sentence.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating circumstance specified in subsection (g) or section 53a-46a . . . or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and if taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence." See footnote 2.

finding as part of the appellate process in this court supports our conclusion that the legislature did not intend § 53a-46b (b) (3) to include the defendant's posited expanded universe of cases.

In general, "[i]t is the function of the trial court, not this court, to find facts." *State* v. *Lafferty,* 189 Conn. 360, 363, 456 A.2d 272 (1983); *State* v. *Ostroski,* 184 Conn. 455, 458, 440 A.2d 166 (1981); *Gallo* v. *Gallo,* 184 Conn. 36, 38, 440 A.2d 782 (1981). Imposing a fact-finding function on this court, therefore, would be contrary to generally established law.[13] "We will not infer that the legislature intended to enact a significant change in existing law without an unequivocally expressed manifestation of legislative intent. *Kinney* v. *State,* 213 Conn. 54, 66, 566 A.2d 670 (1989) . . . ." (Internal quotation marks omitted.) *New Haven* v. *State Board of Education,* 228 Conn. 699, 719, 638 A.2d 589 (1994).

We agree with the state that granting the defendant's motion would require a factual inquiry into the nature and circumstances of every case since 1973 that ended in a homicide conviction in order to determine whether that case could have been charged as a capital felony. Because the defendant seeks to include those cases that could have been, but were not, prosecuted as capital felonies, we would be required to review the prosecutorial discretion exercised in every case since 1973 in which the facts might have indicated that the death penalty could have been sought, and to determine whether the case could have been subject to a capital felony prosecution. As the Nebraska Supreme Court noted in analyzing its own proportionality review

---

[13] In certain circumstances, this court has been given the jurisdiction to engage in a form of fact-finding. See, e.g., Conn. Const., art. III, § 6; see also *In re Election for Second Congressional District,* 231 Conn. 602, 608 n.5, 653 A.2d 79 (1994). In each such instance, however, the constitutional or legislative mandate to do so has been clear and unambiguous.

statute:[14] "In examining prosecutorial discretion we would of necessity have to independently gather evidence. . . . We would then determine what charges we think should have been filed. . . . We would make a judgment about the chances of a conviction as against an acquittal. . . . [And, w]e would need to weigh the advisability of a plea bargain to secure a conviction on a lesser charge in order to avoid a likely acquittal of all charges." *State* v. *Palmer*, 224 Neb. 282, 325, 399 N.W.2d 706 (1986), cert. denied, 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987).

Furthermore, after that expanded universe of cases had been determined, a full evidentiary hearing would be required to consider the statistical evidence and methodology offered by the defendant. This court would then, by way of fact-finding, be required to adjudicate the statistical validity of that evidence and methodology. Cf. *McCleskey* v. *Zant*, supra, 580 F. Sup. 338.[15]

The recognition that the entire process of fact-finding is normally outside of our jurisdiction, and that the fact-

---

[14] The Nebraska Supreme Court considered an interpretation of that state's proportionality review statute that would have imposed a mandate on it "to look behind prosecutorial judgments concerning the charges to be filed, jury verdicts determining the particular degree of homicide, and then, based upon [its] independent findings of the facts in those adjudicated cases, to determine the penalty in the case before [it]." *State* v. *Palmer*, 224 Neb. 282, 324–25, 399 N.W.2d 706 (1986), cert. denied, 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987). The Nebraska Supreme Court concluded that "legislation which attempts to achieve such results is an intrusion on the judicial function, contrary to the separation of powers doctrine . . . ." Id., 325.

[15] The defendant contended at oral argument that we could accomplish this task by appointing a special master to conduct the necessary hearings and make the requisite findings of fact. It is no doubt true that in circumstances where we are required by the constitution or the legislature to engage in fact-finding, we could elect to use a special master to assist us in that mission. We could also appoint a sitting Superior Court judge as such special master for this purpose. That begs the question, however, of whether the legislature intended us to conduct such a fact-finding mission in the first place.

finding that would likely be engendered by the defendant's motion is detailed and complex, counsel strongly against reading § 53a-46b (b) (3) so as to require such a process.[16] Before we were to read a statute so as to impose such a fact-finding process on this court, we should require a clear indication of legislative intent to do so. The total absence from either the language or the legislative history of § 53a-46b (b) (3) of *any* indication of such an intent, let alone a clear indication thereof, leads us to conclude that the legislature did not so intend.

Our conclusion accords with the jurisprudence of the overwhelming majority of states that have capital felony statutes. The defendant's concession that "the universe which he proposes is the minority rule," is a generous characterization of the status of the requested universe. At present, only the Pennsylvania Supreme Court conducts the type of data gathering that the

---

[16] More conventional proportionality review, of course, will require this court to engage in a process different in some respects from the ordinary appellate processes of declaring the law and applying the law to the facts of particular cases. To perform the analysis mandated by § 53a-46b (b) (3), this court will have to decide in the first instance whether the sentence of death imposed on a particular capital defendant is disproportionate in light of the sentences imposed on defendants in factually comparable cases. In making that determination, we are instructed to consider "both the circumstances of the crime and the character and record of the defendant" in both the case directly before us and in the various cases that comprise the universe of "similar cases"; General Statutes § 53a-46b (b) (3); as those facts are described in the appendices to the parties' briefs. See Practice Book § 4066A.

Whether we describe this analysis as involving the finding of facts, the declaring of law or the determining of mixed questions of law and fact is immaterial. Regardless of the label imposed, it clearly does not entail the type of inquiry the defendant seeks to have this court perform in the guise of proportionality review. As the *McCleskey* cases demonstrate, consideration of the defendant's claim would require crucial threshold determinations regarding the credibility of witnesses and the reliability of statistical evidence before any significance can be ascribed thereto. Such findings simply are different in kind from the type of determinations necessitated by conventional proportionality review.

defendant requests. That court noted that "[w]hile the Sentencing Code does not define 'similar cases' nor set forth any specific procedures for conducting this proportionality review, this Court conducts an independent evaluation of all cases of murder of the first degree convictions which were prosecuted or could have been prosecuted under the [death penalty statutes]." *Commonwealth* v. *Frey*, 504 Pa. 428, 443, 475 A.2d 700, cert. denied, 469 U.S. 963, 105 S. Ct. 360, 83 L. Ed. 2d 296 (1984). In order to facilitate this review, the Pennsylvania Supreme Court "ordered the President Judge of each county to supply to the Administrative Office of Pennsylvania Courts (the AOPC) information pertaining to each such conviction and imposed a continuing obligation on the President Judges to update the AOPC with data pertaining to future cases. This information includes the facts and circumstances of the crimes, the aggravating and mitigating circumstances arguably presented by the evidence, the gender and race of the defendant and the victim, and other information pertaining to the conduct and prosecution of the case." Id.

Although the Pennsylvania Supreme Court maintains such records, there is no indication that it engages in the type of proportionality review suggested by the defendant's motion in this case. Instead, that court compares the factual scenario in the defendant's case to factual scenarios in other cases. In *Commonwealth* v. *Frey*, supra, 504 Pa. 443, for example, the extent of the court's proportionality review was as follows: "We have reviewed the information compiled by the AOPC and conclude therefrom that the sentence of death imposed in the instant case is neither excessive nor disproportionate to the penalties imposed in 'similar cases', i.e. 'contract killing' cases." Significantly, although the court gathers information on the race of the victim and the race of the defendant, in no instance,

under proportionality review, has it engaged in statistical analysis of the effect of those factors on the imposition of the death penalty.[17]

The remaining states that conduct proportionality review do so with a significantly narrower universe of cases.[18] Thus, there is no persuasive authority in any

---

[17] The Georgia Supreme Court, also, will "compare cases as to which the death penalty could have been sought by the prosecutor but was not." *Horton* v. *State*, 249 Ga. 871, 880 n.9, 295 S.E.2d 281 (1982). We note, however, that there has been no Georgia appellate decision with respect to proportionality review since the United States decision in *Pulley* v. *Harris*, supra, 465 U.S. 37. Furthermore, there is no indication that the Georgia Supreme Court makes any effort to gather the data itself. New York's recently passed capital punishment statute also may require consideration of cases that could have been, but were not, capitally prosecuted. At present, however, no prosecution under that statute has reached a penalty phase hearing and the New York courts have not yet defined the universe of cases that they will consider.

[18] The plurality of states, like Connecticut, look to cases where a capital felony was charged, irrespective of whether the death sentence was actually imposed. ARKANSAS: Arkansas does not have statutorily required proportionality review, but the Arkansas Supreme Court has made such review mandatory. *Sheridan* v. *State*, 313 Ark. 23, 39–40, 852 S.W.2d 772 (1993) ("Finally, we undertake a 'proportionality review' of [the defendant's] capital case which we have made a requirement under Arkansas law. . . . We review capital cases involving the death penalty to insure that the sentence is not imposed in a freakish, capricious, or whimsical manner. In so doing, [the defendant] would have us compare his case to all capital murder and first degree murder cases occurring after July 3, 1989 . . . involving any death sentence or first degree murder charged as 'premeditated or deliberated.' This is an improper comparison; we only compare death sentence appeals to other death sentence appeals. To do otherwise would be to compare apples to oranges."). DELAWARE: Delaware proportionality review is mandated by statute. In conducting this review, the Delaware Supreme Court includes only "those first degree murder cases which have included a penalty hearing and in which the sentence has become final, either without or following a review by this Court. . . . As this Court has pointed out in prior cases involving the proportionality review, '[a] definitive comparison of the "universe" of cases is almost impossible.' . . . Nevertheless, we have compared [the defendant's] sentences with the penalties imposed in all first degree murder cases which have included a death penalty hearing. Moreover, we have considered objective factors such as the gravity of the offense, the circumstances of the crime, the harshness of the penalty, and the statutory scheme in effect at the time." *Lawrie* v. *State*,

jurisdiction to support the defendant's claim that proportionality should, or was intended to, include

643 A.2d 1336, 1344–45 (Del. 1994). FLORIDA: Florida's capital felony statutes do not require proportionality review. The Florida Supreme Court, like Arkansas, however, has imposed such a requirement upon itself. See *Tillman* v. *State*, 591 So. 2d 167 (Fla. 1991). "Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review *to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.*" (Emphasis in original; internal quotation marks omitted.) Id., 169. IDAHO: Idaho proportionality review is mandated by statute. Idaho courts compares a death sentence to "other first degree murder cases in which the death penalty was imposed as well as those cases in which the death penalty was not imposed." *State* v. *Card*, 121 Idaho 425, 438–39, 825 P.2d 1081 (1991). MARYLAND: Maryland proportionality review is mandated by statute. In so doing, the Maryland Supreme Court stated that "[c]onsidering the purpose of proportionality review in death sentence cases, the language of [the relevant statute], the law in other jurisdictions with proportionality review provisions like our own, and the views expressed by legal commentators, we conclude that the legislatively intended inventory of cases from which 'similar cases' are to be culled encompasses only those first degree murder cases in which the State sought the death penalty . . . whether it was imposed or not." *Tichnell* v. *State*, 297 Md. 464, 468 A.2d 17 (1983). MISSISSIPPI: Mississippi proportionality review is mandated by statute. Mississippi courts "review the record in this case and compare it with other capital murder cases in which [the Supreme] Court has entered judgment." *Foster* v. *State*, 639 So. 2d 1263, 1303 (Miss. 1994). MONTANA: Montana proportionality review is mandated by statute. The Montana Supreme Court compares "cases appealed to this court which involved similar crimes for which the death penalty was or could have been imposed." *State* v. *Kills on Top*, 241 Mont. 378, 787 P.2d 336, 351 (1990). Although this statement could be interpreted as including cases in which the defendant could have been charged with a capital offense but was not, the Montana Supreme Court seems to limit its review to cases where a capital felony was actually charged, whether or not the sentence of death was imposed. NEBRASKA: Nebraska proportionality is mandated by statute. In *State* v. *Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986), cert. denied, 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987), the Nebraska Supreme Court rejected proportionality review that included those cases that could have been prosecuted as capital offenses but had not been. NORTH CAROLINA: North Carolina proportionality review is mandated by statute. "In comparing similar cases for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute . . . which have been tried as capital cases and reviewed on direct appeal by this Court and

## within its universe of cases those cases that could have been charged as capital felonies but were not.

in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time. . . . The pool includes only those cases which this court has found to be free of error in both phases of the trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Bacon*, 337 N.C. 66, 104–105, 446 S.E.2d 542 (1994). SOUTH CAROLINA: South Carolina proportionality review is mandated by statute. The review engaged in by the court, however, is limited to previous capital punishment decisions. See, e.g., *Riddle* v. *State*, 443 S.E.2d 557, 565 (S.C. 1994). VIRGINIA: Virginia proportionality review is mandated by statute. In conducting such review, the Virginia Supreme Court "ha[s] accumulated the records of all capital felony cases . . . as a guide in determining whether the sentence imposed in the case under review is excessive." (Internal quotation marks omitted.) *Kurner* v. *Commonwealth*, 234 Va. 543, 556, 364 S.E.2d 483 (1988). WASHINGTON: Washington proportionality review is mandated by statute. Further, the universe of cases that the Washington Supreme Court will consider in conducting proportionality review is statutorily mandated. The cases from which this comparison takes place are those "reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed . . . and cases in which reports have been filed with the Supreme Court [for convictions of aggravated first degree murder] under [Wash. Rev. Code] § 10.95.120." (Internal quotation marks omitted.) *Ramseyer* v. *Blodgett*, 853 F. Sup. 1239, 1288 (W.D. Wash. 1994). WYOMING: Wyoming proportionality review is mandated by statute. The Wyoming Supreme Court's review is " 'guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.' " *Engberg* v. *State*, 686 P.2d 541, 554 (Wyo.), cert. denied, 469 U.S. 1077, 105 S. Ct. 577, 83 L. Ed. 2d 516 (1984), quoting *Solem* v. *Helm*, 463 U.S. 277, 292, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). In conducting this review, the Wyoming Supreme Court looks to other capital cases. Id., 555. It also looks to cases from other states. Id.

A minority of states conduct proportionality review using a more narrow universe of cases. ALABAMA: Alabama is not required to conduct proportionality review. Nonetheless, in *Nelson* v. *State*, 511 So. 2d 225, 244 (Ala. Crim. App. 1986), the court took judicial notice of the fact that similar crimes are being punished capitally throughout this state. ILLINOIS: Illinois has no specific proportionality requirement. In order to satisfy the eighth amendment requirement that the death penalty is imposed in a rational, consistent, nonarbitrary manner, however, the "court will examine the facts of

The defendant, as does the dissent in this case, relies principally on the New Jersey Supreme Court's inter-

that particular case and the evidence introduced at the trial and death penalty hearing, and, as a matter of reference, it may consider the sentence imposed on an accomplice or a codefendant in light of his involvement in the offense." *People* v. *Bean*, 137 Ill. 2d 65, 135, 560 N.E.2d 258 (1990). INDIANA: Indiana has no proportionality requirement. Instead, the Indiana Supreme Court has held that "because of statewide jurisdiction over . . . cases involving the death penalty or life imprisonment, we are confident that through continuous and exclusive review of such cases, no sentence of death will be freakishly or capriciously applied in Indiana." *Schiro* v. *State*, 451 N.E.2d 1047, 1052 (Ind. 1983). KENTUCKY: Kentucky conducts its statutory proportionality review by considering "all cases in which the death penalty was imposed after January 1, 1970." *Sanders* v. *Commonwealth*, 801 S.W.2d 665, 684 n.10 (Ky. 1990). The Kentucky Supreme Court specifically rejected a claim that such a narrow class of cases was "not sufficient to determine if the death penalty is being applied in an arbitrary and capricious manner." (Internal quotation marks omitted.) Id., 683. LOUISIANA: Louisiana does not have statutorily mandated proportionality review. Nonetheless, that court considers "comparative proportionality review . . . a relevant consideration in determining the issue of excessiveness in Louisiana." *State* v. *Davis*, 637 So. 2d 1012, 1031 (La. 1994). Although Louisiana has not set forth explicitly those cases that it considers similar, it can be inferred from the cases that the court considers only cases in which the death penalty has been imposed. Id. (in conducting proportionality review, "[t]his court has consistently affirmed death penalties in other cases involving killings during the course of a robbery"). MISSOURI: Missouri does not have statutorily required proportionality review. Nonetheless, its Supreme Court compares cases to other cases in which the death penalty has been imposed. See *State* v. *Reuscher*, 827 S.W.2d 710 (Mo. 1992). NEVADA: Nevada proportionality review is mandated by statute. The Nevada Supreme Court's review, however, is extremely cursory, comparing cases only to others with similar fact patterns where the death penalty had been imposed. E.g., *Libby* v. *State*, 109 Nev. 905, 919, 859 P.2d 1050 (1993) ("[c]onsidering the heinous nature of the killings, we conclude that the sentence was not excessive or disproportionate to the penalty imposed"). NEW JERSEY: New Jersey, in 1992, amended its proportionality review, limiting it to a comparison of similar cases in which a sentence of death has been imposed. N.J. Stat. Ann. § 2C:11-3 (West). NEW MEXICO: New Mexico proportionality review is mandated by statute. The New Mexico Supreme Court will "review [the proportionality] issue only when *raised on appeal*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Wyrostek*, 117 N.M. 514, 521, 873 P.2d 260 (1994). Further, the purpose of proportionality review "is best achieved when a court of statewide jurisdiction . . . conduct[s] comparisons between *death sentences imposed by differ-*

pretation of its pre1992 proportionality review statute. Thus, the defendant offers New Jersey as a model for

*ent judges or juries within the State.*" (Emphasis added; internal quotation marks omitted.) Id., 523. The court also noted that "[t]he determination of whether a death sentence is excessive or disproportionate requires review of the facts in the trial record pertaining to the crime, including evidence of aggravation and mitigation. . . . *Evidence of aggravation and mitigation is not fully developed until after conviction when such evidence is presented during the sentencing phase of the capital murder trial. . . . Thus, the determination of death sentence proportionality could happen no earlier than after the evidence of aggravating and mitigating circumstances has been presented at the sentencing hearing.*" (Citations omitted; emphasis added.) Id., 518. OHIO: Ohio proportionality review is mandated by statute. "[T]he proportionality review mandated by [the statute] is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed. . . . [It] does not require a review of those cases in which a sentence of life imprisonment is imposed. . . . [W]e continue to believe that the proportionality review conducted by appellate courts in this state is the best available approach to ensure fair sentencing determinations . . . ." (Internal quotation marks omitted.) *State v. Davis,* 63 Ohio St. 3d 44, 50, 584 N.E.2d 1192 (1992). "Additionally . . . disparity of sentence does not justify reversal of a death sentence when the sentence is neither illegal nor an abuse of discretion." *State v. Green,* 66 Ohio St. 3d 141, 151, 609 N.E.2d 1253 (1993). TENNESSEE: Tennessee proportionality review is mandated by statute, comparing only cases in which the death penalty was imposed. See *State v. Howell,* 868 S.W.2d 238 (Tenn. 1993).

A small number of states decline to conduct any sort of proportionality review. CALIFORNIA: California has no statutorily required proportionality review and has never imposed such review judicially. See *People v. Lang,* 49 Cal. 3d 991, 1045, 782 P.2d 627, 264 Cal. Rptr. 386 (1989) ("[The d]efendant's motion in the trial court requested intercase review, an examination of whether imposition of the death penalty in this case is disproportionate to the penalties imposed on other persons for similar offenses. Intercase proportionality review is not constitutionally required . . . and we have consistently declined to undertake it . . . . We likewise decline to authorize or require intercase proportionality review by trial courts." [Citations omitted.]). COLORADO: Colorado has no statutory proportionality review, and none is engaged in by the court. See *People v. Davis,* 794 P.2d 159 (Colo. 1990). OKLAHOMA: Oklahoma proportionality review, formerly governed by statute, was abolished by the legislature in 1985. Prior to the repeal of proportionality review, the Oklahoma Supreme Court would "look to all of the facts and circumstances of the particular case to determine whether the sentence imposed shocks the conscience of this Court." *Battenfield v. State,* 816 P.2d 555, 564 (Okla. Crim. App. 1991). OREGON:

conducting our proportionality review. We agree with the New Jersey Supreme Court that "[h]ow detailed a compilation of homicide cases is required to facilitate an adequate proportionality review of a given death sentence depends on the purposes to be served by that review." *State* v. *Marshall*, 130 N.J. 109, 132, 613 A.2d 1059 (1992). Unlike that court, however, we reject the conclusion under our proportionality review statute that "the purposes to be achieved by proportionality review require that the universe include clearly death eligible homicides in which the prosecutor elected not to seek the death penalty." Id., 137. Two factors persuade us not to follow the lead of New Jersey in interpreting our proportionality review statute.

First, the New Jersey Supreme Court, in reaching its conclusion, was interpreting a statutory scheme significantly different from ours, because it contained no analog to our § 53a-46b (b) (1). New Jersey Statutes § 2C:11-3 e., as it stood at the time of the cases upon which the defendant relies, provided: "Every judgment of conviction which results in a sentence of death under this section shall be appealed, pursuant to the Rules of Court, to the Supreme Court. Upon the request of the defendant, the Supreme Court shall also determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. In any instance in which the defendant fails, or refuses to appeal, the appeal shall be taken by the Office of the Public Defender or other counsel appointed by the Supreme Court for that pur-

Oregon does not require proportionality review, either by statute or by court edict. See *State* v. *Cunningham*, 320 Or. 47, 880 P.2d 431, 441–42 (1994). TEXAS: Texas does not conduct proportionality review. See *Pulley* v. *Harris*, supra, 465 U.S. 49–50. UTAH: Utah does not conduct proportionality review. See *State* v. *Carter*, 888 P.2d 629, 657 (Utah 1995).

Arizona, New Hampshire, New York and South Dakota all have proportionality review mandated by statute but the universe of cases that they will consider is not clear from reported decisions.

pose." Thus, the New Jersey death penalty statutory scheme contained no explicit provision, other than proportionality review, pursuant to which a defendant who sought to pursue a claim of systemic racial bias could proceed.

Our statutory scheme, by contrast, provides, in addition to proportionality review under § 53a-46b (b) (3), which is essentially the same as that of New Jersey, that this court "shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor." General Statutes § 53a-46b (b). Thus, as we explicitly hold in this case, our scheme does provide a statutory mechanism by which a defendant may raise such a claim based upon an adequate factual record.

Second, New Jersey has, subsequently, legislatively overruled the New Jersey Supreme Court's interpretation of its proportionality review statute. In 1992, New Jersey amended that statute specifically to limit the universe of cases for proportionality review to a "comparison of similar cases *in which a sentence of death has been imposed* . . . ."[19] (Emphasis added.) N.J. Stat. Ann. § 2C:11-3 e. The legislative history of this amendment indicates that it occurred, in part, because of the failure of the court-ordered proportionality review; see *State* v. *Ramseur*, 106 N.J. 123, 327, 524 A.2d 188 (1987); to establish a proper and workable universe of cases. Testifying in favor of the proposed bill before the New Jersey Judiciary, Law and

_____

[19] Act No. 894 of the New Jersey Assembly as originally introduced, stated that "[p]roportionality review under this section *shall consist of* a comparison of similar cases in which a sentence of death has been imposed under subsection c. of this section." (Emphasis added.) Before the act passed, the legislature changed the phrase "shall consist of" to "shall be limited to" in order to clarify that "the Supreme Court conduct a proportionality review of a death penalty case as compared *only* to other death penalty cases in which a sentence of death [was] imposed, not to all murder cases." (Emphasis added.) P.L. 1992, c.5, Assembly Act No. 894. (First Reprint) footnote.

Public Safety Committee, New Jersey Attorney General Robert J. Del Tufo stated that three years after the proportionality review imposed by the New Jersey Supreme Court had begun, in spite of considerable resources dedicated to the project, the universe of cases to be considered in conducting proportionality review still had not been defined. Public Hearing before New Jersey Assembly Judiciary, Law and Public Safety Committee (January 31, 1991) p. 3, remarks of Attorney General Robert J. Del Tufo. Del Tufo also argued against a universe that includes "all homicide cases which could have been prosecuted as death penalty cases under [the] current law, regardless of whether they were so prosecuted. The expansive review system envisioned by this universe of cases would add an unnecessary, complex, second stage to judicial review of death sentences, which would further delay an interminably long and oft-criticized appellate procedure. Once an additional appeal . . . is exhausted . . . the review process would then begin anew with wholesale reevaluation and veto power over the prior decisions of prosecutors, judges, and juries. Such a back-to-square-one revisitation of capital prosecutions could further frustrate enforcement of the death penalty . . . ." Id., pp. 5–6. Del Tufo also argued that the process contemplated by the New Jersey Supreme Court would be "uncertain, unreliable, and ultimately futile." Id., p. 7.

## IV

Our conclusion on this motion that the defendant's challenge may not be brought under § 53a-46b (b) (3) does not foreclose the possibility that the defendant may mount such an attack in other ways. As both the state and the defendant agree, he could have proceeded pursuant to § 53a-46b (b) (1), claiming that the statistical analysis he seeks to establish demonstrates that his death sentence was the product of "prejudice or any

other arbitrary factor."[20] Alternatively, he may have a remedy by filing a petition for a writ of habeas corpus.

Even under § 53a-46b (b) (1), however, it would have been necessary for the defendant to have made his statistical record in the trial court, and to have subjected it to a full evidentiary hearing, as in *McCleskey*, before presenting it on appeal. To hold that he could raise this claim on appeal under § 53a-46b (b) (1), without having first created an adequate factual basis in the trial court, would be incorrect for many of the same reasons that we reject his claim under § 53a-46b (b) (3), because it would assume, without any clear indication, that the legislature intended this court to engage in the same extraordinary process of data gathering and fact-finding. Thus, both subdivision (1) and subdivision (3) of § 53a-46b (b) ordinarily contemplate not data gathering and fact-finding by or under the aegis of this court from disputed evidence, which the defendant's claim would require, but evaluation by this court of the trial court record of the case on appeal, and with respect to subdivision (3), of the trial court records of similar cases.

Moreover, even though the defendant has not created a trial record in this case that would permit him to present, in his direct appeal, his statistical claim under § 53a-46b (b) (1), we conclude that he should be permitted to do so by way of a postappeal habeas corpus

---

[20] We emphasize that we do not decide whether a statistical study comparable to that offered in *McClesky* v. *Zant*, supra, 580 F. Sup. 338, would establish a violation of § 53a-46b (b) (1) in any particular case, nor do we suggest that only such a broadscale attack could establish such a violation. Obviously, if the record in any given case indicated that, irrespective of any statistics, the death sentence was the product of passion, prejudice or any other arbitrary factor incident to that particular trial, there would be a violation of § 53a-46b (b) (1). We conclude only that, subject to the requirement that the defendant make his statistical challenge at trial, § 53a-46b (b) (1) provides an appropriate statutory vehicle for his statistical claim on appeal.

petition, if the ultimate disposition of his direct appeal renders his claim still viable. Although ordinarily habeas corpus cannot serve as a surrogate for a claim that could have been presented on direct appeal; see *Summerville* v. *Warden*, 229 Conn. 397, 419, 641 A.2d 1356 (1994); *Payne* v. *Robinson*, 207 Conn. 565, 568, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988); we conclude that, with respect to the claim that the defendant seeks to present by this motion, he should not be bound by that principle because the scope and meaning of § 53a-46b (b) have remained uncertain and, until now, have been the subject of only one published decision of this court, namely *Ross I*.[21] Furthermore, the nature of the defendant's claim of systemic racial bias, and the seriousness and finality of the death penalty, counsel against raising any undue procedural barriers to review of such a claim.

The motion is denied.

In this opinion PETERS, C. J., and CALLAHAN, J., concurred.

BERDON, J., with whom NORCOTT and KATZ, Js., join, dissenting. The defendant, Sedrick H. Cobb, is an

[21] We do not decide whether, as a matter of state law, all other criminal defendants may raise the type of claim under consideration here in a habeas corpus petition when the claim was not raised at trial in the first instance. Cf. *Summerville* v. *Warden*, supra, 229 Conn. 421–22 (recognizing exception to cause and prejudice standard governing procedural defaults for claims of factual innocence). We merely decide that this defendant and any other capital felony defendants who already have been sentenced to death or against whom proceedings have sufficiently progressed on the date of publication of this opinion to make it impracticable for them to raise such a claim at this point are not foreclosed from raising such a claim for the first time in any habeas proceedings that may ensue. We leave to another day, and to a case that properly presents it, the question of whether a defendant who had ample notice and opportunity, as a result of the publication of this opinion, to create a trial court record sufficient for an appellate claim under § 53a-46b (b) (1) in his direct appeal, but did not do so, could nonetheless do so by way of a postappeal habeas corpus action.

African-American male who was sentenced to death for the murder of a white female.[1] Before this court is the defendant's appeal of his convictions and the mandatory, statutory review of his sentence of death. See General Statutes § 53a-46b.[2] He now moves for this court to enlarge the class of cases that we should consider in determining whether his sentence of death was proportionate to the penalty that has been imposed on other defendants in "similar cases." By doing so, he argues, he will be able to demonstrate that, in Connecticut, the race of the defendant and the race of the victim impermissibly influence the decision of whether a

---

[1] The defendant was convicted of two counts of capital felony in violation of General Statutes § 53a-54b (5) and (7), two counts of first degree kidnapping in violation of General Statutes § 53a-92 (a) (2) (B) and (A), murder in violation of General Statutes § 53a-54a (a), third degree robbery in violation of General Statutes § 53a-136 (a), and first degree sexual assault in violation of General Statutes § 53a-70 (a). A three judge sentencing panel found that the defendant had murdered his victim in an especially cruel and heinous manner and imposed two sentences of death, one on each of the two capital felony counts. The panel, concluding that the kidnapping, sexual assault and murder counts were lesser included offenses of the capital felonies, did not impose additional sentences for those convictions. The panel sentenced the defendant to five years in prison on the robbery count.

[2] General Statutes § 53a-46b provides: "REVIEW OF DEATH SENTENCE. (a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

criminal defendant is sentenced to death. I would grant the defendant's motion.

Section 53a-46b (b) (3) requires this court to overturn a sentence of death if we find that "the sentence is excessive or disproportionate to the penalty imposed in *similar cases*, considering both the circumstances of the crime and the character and record of the defendant." (Emphasis added.) Practice Book § 4066A (b) limits this class of "similar cases" to only those capital felony cases that (1) have been prosecuted in this state since October 1, 1973, and (2) have resulted in conviction and proceeded to a hearing on whether the penalty of death should be imposed.[3] In *State* v. *Ross*, 225 Conn. 559, 561, 624 A.2d 886 (1993) (*Ross I*),[4] this court indicated that, in addition to this category of "similar cases," it also is appropriate to consider "any case in which a capital felony conviction has been obtained and the conviction was followed not by a hearing on the imposition of the death penalty but by an imposition of a sentence other than death . . . ."

The defendant in this case, through the special public defender appointed to represent him on that portion of his appeal that involves the proportionality of his sentence,[5] has supplied this court with data that, in my view, requires us again to expand the universe

[3] See footnote 10 of the prevailing justices' opinion.

[4] *Ross I* was this court's published ruling on a motion by the defendant, Michael Ross, to enlarge the class of "similar cases" that this court should consider in conducting proportionality review. This court subsequently reviewed the substantive claims of the defendant and affirmed his conviction in *State* v. *Ross*, 230 Conn. 183, 306, 646 A.2d 1318 (1994), cert. denied, U.S. , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (*Ross II*).

[5] The defendant is being represented by two public defenders in this appeal. The first public defender is challenging his death sentence under the first two subdivisions of § 53a-46b (b), while a second, special public defender is challenging his death sentence under the third subdivision. It is the latter public defender who has filed this motion on behalf of the defendant.

of similar cases to which we look in determining whether a death sentence is proportionate. In sum, the defendant argues that this court also should consider those cases arising since October 1, 1973, that represent "homicide convictions in Connecticut in which a capital felony could have been charged." This, of course, would include as "similar cases" those homicides that were not prosecuted as capital felonies as a result of prosecutorial discretion.

In support of his motion, the defendant cites disturbing preliminary data, the accuracy of which the state does not challenge.[6] First, the data indicates that of all the defendants who have been charged with capital felony, African-American defendants have been convicted twice as often—and, therefore, have been subjected to the death penalty twice as often—as defendants who are not African-American.[7] In other words, if a defendant who is not African-American is charged with capital felony, there is a 200 percent greater chance that the jury will return a verdict of not guilty on that charge, and therefore not subject him to the death penalty, than if the defendant is African-American.

---

[6] Unless otherwise indicated, the data is limited to Connecticut and is based on events occurring between October, 1973, and October, 1994. Statistics concerning murder rates in Connecticut were calculated by counsel based on data supplied by the Criminal Justice Information Services Division of the Federal Bureau of Investigation and the Uniform Crime Reporting Program of the State of Connecticut.

[7] According to the defendant, the state has prosecuted sixty-six cases of capital felony, twenty-one of which involved African-American defendants and forty-five of which involved defendants who are not African-American. The African-American defendants were convicted of capital felony 62 percent of the time (thirteen/twenty-one). The defendants who were not African-American were convicted of capital felony only 33 percent of the time (fifteen/forty-five).

Michael Ross, who is not African-American, was convicted of three separate capital felonies, and the foregoing statistics count these felonies as separate prosecutions. If counted as one prosection, the defendants who were not African-American were convicted only 30 percent of the time (thirteen/forty-three), less than one-half the conviction rate of African-American defendants.

Second, the data indicates that the death penalty is more likely to be imposed if the victim of the crime was white or otherwise not African-American. The defendant points to several specific instances:

(1) Those defendants who murder African-Americans are substantially less likely to be charged with capital felony and, consequently, substantially less likely to be subject to the death penalty, than those defendants who murder persons who are not African-Americans.[8]

(2) None of the defendants now on death row was sentenced to death for the murder of an African-American, although 40 percent of those persons murdered in this state since 1976 have been African-American.

(3) Of the twenty-eight cases in which a person was convicted of capital felony, only four, or 14 percent, have involved a victim who was African-American. As indicated previously, however, 40 percent of murder victims since 1976 have been African-American.

(4) Of the eighteen cases that have proceeded to the "death penalty phase" hearing, only one, or 5.5 percent, involved a victim who was African-American.

(5) If the victim was an African-American, those defendants who are accused of kidnapping and murder—two of the specific crimes of which the defendant in this case was convicted—will not be charged with capital felony, and therefore will not be subject to the death penalty.[9]

---

[8] According to the defendant, since 1976, 40 percent of all murder victims in this state have been African-American. In contrast, since October, 1973, prosecutors have charged a defendant with capital felony in only 15 percent of the homicide cases in which the victim was African-American (eleven/seventy-four).

[9] According to the defendant, the state has charged eighteen defendants with capital felony for committing murder during the course of a kidnapping. None of these prosecutions involved a victim who was African-American.

(6) Similarly, if the victim was an African-American, those defendants who are accused of sexual assault and murder—also two of the specific crimes of which the defendant in this case was convicted—will very rarely be charged with capital felony, and therefore will very rarely be subject to the death penalty.[10]

The significance of the capital felony data brought forward by the defendant may be summarized as follows. If the defendant is an African-American, he is more likely to receive the death penalty than if he were white. If the victim is white, a defendant also is more likely to receive the death penalty. If the defendant is an African-American and the victim is white, the defendant is highly more likely to receive the death penalty.

Although the accuracy of the data is not challenged, the state and the defendant both recognize that it is preliminary and that additional research, as well as mathematical analysis, must be conducted in order to determine whether these results are statistically significant. The defendant states, however, that an expanded proportionality universe including all capital eligible homicides will reveal "startling information about the effect of the race of the defendant and the race of the victim on death penalty outcomes in Connecticut which calls into question whether the death penalty scheme has been proportionately applied to [African-American] defendants or to defendants whose victims were white."

If the defendant is correct, the inevitable conclusion is that the state places a higher value on the life of a white person than on the life of an African-American.

---

[10] According to the defendant, the state has charged twelve defendants with capital felony for committing murder during the course of sexual assault in the first degree. Only one of these prosecutions involved a victim who was African-American.

Such a capital system—in which a person's race is more likely than not a factor in whether that person lives or dies—cannot withstand proportionality review under § 53a-46b (b) (3). Indeed, it cannot withstand constitutional scrutiny. The Supreme Court of the United States has made clear that if there is even a "risk" that racial prejudice has tainted the capital sentencing process, the defendant must be provided an opportunity to ferret out that evidence. "The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence. The Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination. . . . We have struck down capital sentences when we found that the circumstances under which they were imposed created an unacceptable risk that the death penalty [may have been] meted out arbitrarily or capriciously or through whim . . . or mistake." (Citations omitted; internal quotation marks omitted.) *Turner* v. *Murray*, 476 U.S. 28, 35–36, 36–37, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986) (holding "that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias"). Indeed, the state concedes that if the defendant is correct, and if reliable statistics demonstrate that defendants are being subjected to the death penalty on the basis of their race, the death penalty system would be "unconstitutional as applied."

Nevertheless, the prevailing justices[11] reject the defendant's motion. They conclude, as a matter of

---

[11] Six justices heard and voted on this motion. Three of these six justices, Berdon, Norcott and Katz, Js., voted to grant the motion. The other three, Peters, C. J., and Borden and Callahan, Js., voted to deny the motion. The

statutory construction, that the defendant cannot raise issues of racial bias under proportionality review.[12] They also conclude that this court is not an appropriate forum in which to conduct a factual inquiry of the type urged by the defendant. I disagree with both rationales.[13]

## I

In order to construe the scope of proportionality review, it is necessary to begin with the plain language of the relevant statute. "This court has consistently

seventh justice of this court, Palmer, J., is disqualified from hearing this case. The motion failed because a majority of the sitting justices did not vote in favor of granting it.

[12] The prevailing justices also conclude that this court's decision in *Ross I* controls this case, and precludes this court from expanding the universe of similar cases in the manner urged by the defendant. They claim that the issue of racism "was squarely before this court by virtue of the claims contained in [the *Ross I*] motion." As support, they point to an obscure reference to the word "race," which appeared in the defendant's motion papers in *Ross I*. The defendant had quoted from a Maryland case, which in turn had quoted from a case in a third jurisdiction. It was that third jurisdiction that had employed the word "race." Yet the prevailing justices now use that most tenuous of connections to assert that the issue of race was "squarely" before the court in *Ross I*. That simply is not the case.

In *Ross I*, the defendant made no claim that racism played a part in the imposition of the death penalty. Rather, the defendant sought only to change this court's interpretation of "similar cases," as that term is used in § 53a-46b (b) (3). In essence, the defendant argued that Practice Book § 4066A (b), which defined that term, adopted too restrictive an interpretation of what "similar cases" actually means. In so arguing, the defendant made no claim that different interpretations of the language could have a racial impact. He certainly presented no evidence to this effect. Given that background, the conclusion of the prevailing justices today—that the decision in *Ross I* controls the outcome of this motion and that the doctrine of stare decisis is somehow implicated—eludes me.

[13] The prevailing justices imply that I am sounding a false "alarm" with respect to the significance of the data. See footnote 4 of their opinion. I recognize that the data is preliminary. Nevertheless, preliminary or not, the data suggests that our capital sentencing system favors the life of a white person over the life of an African-American. To the extent that such a charge may be accurate, I believe that it warrants, at the very least, "alarm."

stated that [i]f the language of the statute is clear and unambiguous, it is assumed that the words themselves express the intention of the legislature and there is no room for judicial construction." (Internal quotation marks omitted.) *Vaillancourt* v. *New Britain Machine/ Litton,* 224 Conn. 382, 395, 618 A.2d 1340 (1993). The statute that empowers this court to review the proportionality of a defendant's sentence of death is clear and unambiguous. "The supreme court shall affirm the sentence of death unless it determines that . . . (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes § 53a-46b (b).

The prevailing justices contend that the plain language of proportionality under § 53a-46b (b) (3) contemplates *only* "an individualized process of comparison among cases in which the defendant has been convicted of a capital felony and in which the sentencer either has or has not imposed the death penalty. The statute contemplates a process of comparing the circumstances of one particular crime and the character and record of one particular defendant with the particular circumstances of other particular crimes committed by other particular defendants." The prevailing justices do not discuss any other alternatives that fall clearly within the purview of the plain language of the statute, suggesting that there are none.[14] Although I agree that one segment of proportionality review requires a com-

---

[14] Although the prevailing justices assert that the plain language of the statute "is inconsistent . . . with a comparison of the entire decision-making process engaged in by all the relevant actors in all homicide cases prosecuted since 1973," they offer no analysis to support this conclusion. Indeed, I fail to understand why it would be "inconsistent" for this court to determine whether systematic racial bias caused an undue, disproportionate number of African-Americans to be charged with capital felonies, and therefore to be subjected to the death penalty. To the contrary, this is exactly the type of inquiry that § 53a-46b (b) (3) demands.

parison between the sentence imposed on the defendant and the sentences imposed on other defendants who have been convicted of capital felonies, I do not agree that this is the sole comparison, nor the most important comparison, that is required by the clear language of the statute.[15]

"A court should accord a statutory enactment its plain meaning." *State* v. *Jimenez*, 228 Conn. 335, 341, 636 A.2d 782 (1994). "Where a statute . . . does not define a term, it is appropriate to focus upon its common understanding as expressed in the law and upon its dictionary meaning." (Internal quotation marks omitted.) *AirKaman, Inc.* v. *Groppo*, 221 Conn. 751, 756–57, 607 A.2d 410 (1992). Section 53a-46b (b) (3) requires this court to determine whether the defendant's sentence of death is "disproportionate," or not proportionate. The word "proportion"[16] means "the relation of one part to another or *to the whole* with respect to magnitude, quantity, or degree . . . [a] harmonious relation of parts to each other or to the whole . . . ." (Emphasis added.) Webster's Third New International Dictionary. Thus, the plain language of the statute allows a defendant to compare himself or herself to persons in similarly situated groups in order to determine whether the sentence imposed is proportionate not only as to other individuals, but to the group

[15] I strongly disagree with the assertion of the prevailing justices that the legislative history of § 53a-46b (b) (3) *"supports the conclusion* that the statute does not contemplate the kind of universe advocated by the defendant." (Emphasis added.) The prevailing justices themselves have noted that the legislative history on this issue is "sparse," and that not one legislator expressly mentioned proportionality review during the legislative proceedings. Yet the prevailing justices somehow conclude that this complete absence of legislative history supports their view. I have discovered no other instance in which this court has relied on a vacuum of legislative history to reach a particular conclusion.

[16] The definition of proportionate, which is to "give due proportions to," requires reference to "proportion." See Webster's Third New International Dictionary.

as a whole. Unless one is willing to say that cases are dissimilar merely because of the race of the victim, or because of the race of the defendant, cases in which the penalties differ on the basis of race must be considered during proportionality review.

The interpretation suggested by the prevailing justices leads to a bizarre result. According to that interpretation, this court, in considering whether a sentence of death is "disproportionate," should look only at other individual defendants who have been convicted of capital felonies. Yet it is the contention of the defendant that, as a result of systemic racial bias, the individuals who comprise that class are disproportionately African-American. If the defendant is correct, the interpretation offered by the prevailing justices would not reveal this disproportionality, because that interpretation would compare an African-American defendant's sentence only with the sentences imposed on other African-Americans who similarly were victims of racial discrimination. The reasoning of the prevailing justices would lead to the conclusion that a sentence of death for an African-American defendant satisfies the test of proportionality even if the *only* persons sentenced to death or convicted of capital felonies are African-Americans. "We cannot presume that the legislature intended to create such a bizarre result, but intended a sensible statutory construction." (Internal quotation marks omitted.) *DeMilo* v. *West Haven*, 189 Conn. 671, 679, 458 A.2d 362 (1983); *State* v. *Campbell*, 180 Conn. 557, 563, 429 A.2d 960 (1980).

Nevertheless, the state and the prevailing justices contend that there are other adequate procedural vehicles that the defendant can use to raise such claims. The state, for example, contends that the first subdivision of § 53a-46b (b)—which requires this court to determine whether the sentence was a "product of passion, prejudice or any other arbitrary factor"—already

allows a defendant to raise such claims, and that allowing a defendant also to raise such claims under the third subdivision would give a defendant duplicative sources of appellate review.[17] Similarly, the prevailing justices suggest that the defendant need not be concerned about this issue because it has carved out a special exception, just for this defendant, that will allow him to raise it later during a habeas corpus proceeding, if this court affirms the judgment of conviction. These arguments must be rejected.

Proportionality review of a defendant's death sentence is meant as a catchall review and a final safety net to prevent overt bias and other forms of discrimination from impermissibly affecting the decision of whether a person is to live or to die.[18] "Proportionality review . . . acts as a check against the random and arbitrary imposition of the death penalty . . . . Discrimination on the basis of race, sex, or other suspect characteristic cannot be tolerated. As the Florida Supreme Court stated: [Proportionality r]eview by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another man live on the basis of race, or a woman live and a man die on the basis of sex. If a

---

[17] Jack W. Fischer, the assistant state's attorney who represented the state during oral argument on this motion, took the position that if statistics show that defendants are being sentenced to death in Connecticut because of their race, this court should be "absolutely concerned, but in a proper place."

[18] The prevailing justices, in footnote 18 of their opinion, meticulously survey the statutes of other states in order to demonstrate the narrow scope of proportionality review in those jurisdictions. They do not, however, point to any instance, in any of those jurisdictions, in which a defendant raised a claim like the one raised by the defendant in this case: that sentences of death are disproportionate because they have been imposed in a racially discriminatory manner. Consequently, this survey is not helpful in determining whether courts in any of these states would allow such a claim of racial discrimination to be raised during proportionality review.

defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great. Thus, the discretion charged in *Furman* v. *Georgia*, [408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)], can be controlled and channeled until the sentencing process becomes a matter of reasoned judgment rather than an exercise in discretion at all. . . .

"Proportionality review therefore is a means through which to monitor the imposition of death sentences and thereby to prevent any impermissible discrimination in imposing the death penalty." (Citations omitted; internal quotation marks omitted.) *State* v. *Ramseur*, 106 N.J. 123, 327, 524 A.2d 188 (1987); *Ross I*, supra, 225 Conn. 564–65 (*Berdon, J.*, dissenting). It is irrelevant, therefore, whether a defendant may also allege that racial bias caused his death sentence to be "arbitrary," thereby bringing his claim within the rubric of the first subdivision of § 53a-46b (b). Because such a claim goes to the very heart of the proportionality of his sentence of death, the defendant may also raise it under proportionality review.[19]

---

[19] Moreover, the state's argument against hearing the defendant's claim of racial bias during proportionality review—that doing so would, in effect, give the defendant two bites at the appellate apple—fails under the circumstances of this case. As indicated above; see footnote 5 of this dissent; this motion has been filed on behalf of the defendant by the special public defender appointed to represent him on that portion of his appeal that involves the proportionality of his sentence. The public defender who represents the defendant on the challenge to his death sentence under the first subdivision of § 53a-46b (b) has indicated he will not raise a claim of systematic racial bias such as the one introduced in this motion. Thus, unless this court grants the defendant's motion to expand the universe of "similar cases," the defendant's claim of systematic, preprosecution racial bias will go unheard and unproven in the Supreme Court of Connecticut. Such a result is intolerable.

Indeed, by not granting the defendant's motion, this court places the defendant in an intolerable position. As indicated previously, the defendant is represented by two attorneys, both of whom were appointed by the state. One of these attorneys intends to raise the issue of racial bias, and

Similarly, for two reasons, I am unable to accept the assertion of the prevailing justices that habeas corpus relief for this defendant provides an adequate and timely remedy. First, the defendant must be allowed to learn now, at this stage of the proceedings, if his sentence of death was racially motivated. He should not have to live from day to day with the prospect that he may end up in the death chamber if, in fact, he likely received that sentence because of the color of his skin. Second, if our capital sentencing system is infected with racism, we must expose that ugly truth as soon as possible. The public and other branches of state government, as well as other defendants who face the death penalty, must know the answer now. This is not a problem that should wait to be resolved on a postconviction motion for habeas corpus. Indeed, by making such a suggestion, the prevailing justices fail to recognize the fundamental importance of the issue raised by the defendant. When confronted with an issue of racism, splitting hairs by a narrow construction of a statutory scheme is not acceptable.

## II

The prevailing justices also claim that granting the defendant's motion would impose an inappropriate burden on the courts to conduct a factual inquiry into the nature and circumstances of those cases in which the prosecutor decided not to pursue the death penalty. They and the state advance several reasons why such a factual inquiry should not be conducted as part of our proportionality review: (1) § 53a-46b (b) (3) does not contemplate the making of such factual determinations;

---

the other attorney does not. The state now argues that the attorney who does not intend to raise this issue is, in fact, the one who should raise it. This procedural backdrop, combined with the refusal of the prevailing justices to expand the universe of similar cases, has effectively deprived the defendant of both counsel and the opportunity to raise in a timely manner a relevant, sensitive and important issue.

(2) this court is ill-equipped to undertake the fact-finding process necessary to determine which homicide cases could have been charged as capital felonies; and (3) such an inquiry would require the court to delve into the prosecutor's motivation in deciding how to charge a defendant for a certain criminal act, an inquiry that the state argues should be insulated from review. None of these arguments is persuasive.

The legislature specifically requires this court to consider facts and to assume the role of fact finder in death penalty cases. Section 53a-46b (b) requires this court, in addition to conducting its standard review of a defendant's conviction, to gauge the proportionality of a defendant's sentence of death. Furthermore, § 53a-46b (b) (3) requires us to engage in a comparison of the penalties imposed in "similar cases." See also Practice Book § 4066A (b) (limiting the universe of "similar cases" to which this court must look in conducting review); *Ross I*, supra, 225 Conn. 561 (same). Finally, that statute requires us to consider "both the circumstances of the crime and the character and record of the defendant." All of these determinations are fact bound and require this court to assume the role of a fact finder. Accordingly, with respect to the proportionality of the death sentence, this court is required to depart from its traditional role.

Furthermore, appellate courts in other jurisdictions already undertake the same fact-finding process that the defendant in this case asks this court to adopt. In New Jersey, for example, where the proportionality review statute was strikingly similar to our own,[20] the Supreme Court held that "the purposes to be achieved

[20] The New Jersey Capital Punishment Act provided that upon the "request of the defendant, the Supreme Court shall . . . determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.J. Stat. Ann. § 2C:11-3 e. (West).

by proportionality review require that the universe include clearly death eligible homicides in which the prosecutor elected not to seek the death penalty"; *State v. Marshall*, 130 N.J. 109, 137, 613 A.2d 1059 (1992); and utilized data compiled by a court-appointed special master in order to conduct this review. See id., 137–88. Similarly, in Pennsylvania, where the proportionality review statute also was similar to our own,[21] the Supreme Court "conducts an *independent evaluation* of all cases of murder of the first degree convictions which were prosecuted or could have been prosecuted [as death-eligible felonies]." (Emphasis added.) *Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, cert. denied, 469 U.S. 963, 105 S. Ct. 360, 83 L. Ed. 2d 296 (1984). The court explained its fact-finding process: "In order to facilitate our review, this Court has ordered the President Judge of each county to supply to the Administrative Office of Pennsylvania Courts (the AOPC) information pertaining to each such conviction and imposed a continuing obligation on the President Judges to update the AOPC with data pertaining to future cases. This information includes the facts and circumstances of the crimes, the aggravating and mitigating circumstances arguably presented by the evidence, the gender and race of the defendant and the victim, and other information pertaining to the conduct and prosecution of the case. The data will be compiled and monitored by the AOPC to insure that the body of 'similar cases' is complete and to expedite our proportionality review." Id.

Like the appellate courts in sister states, this court, too, could appoint a special master or a state trial referee to marshall the evidence and determine which

---

[21] Section 9711 (h) (3) (iii) of title 42 of the Pennsylvania Consolidated Statutes Annotated (1982) required the Supreme Court to review each death sentence to determine whether it is "excessive or disproportionate to the penalty imposed in similar cases . . . ."

homicide cases arising since 1973, resulting in convictions, could have been prosecuted as capital felonies. During such a procedure, both the state and the defendant would have an opportunity to present evidence and to be heard. Moreover, although the state argues that such a project could involve large numbers of cases and prove overwhelming, that has not been the experience in other jurisdictions. Indeed, most cases can be ruled out fairly quickly. In New Jersey, for example, the study began with 3200 homicides. After a threshold screen that excluded cases involving automobile related deaths, juvenile defendants and acquittals, only 1496 cases remained. Of those, the special master identified 246 that were clearly death eligible. Excluded from the final analysis were 250 questionable cases that were not clearly death eligible. See *State* v. *Marshall*, supra, 130 N.J. 138–39. Finally, the bulk of the research and fact-finding would only have to be done a single time, for once a historical record of cases dating back to 1973 is assembled, it would only have to be updated on a regular basis.

In summary, as Justice Brennan, joined by Justices Marshall, Blackmun and Stevens, pointed out in his dissent in *McCleskey* v. *Kemp*, 481 U.S. 279, 335, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), due to the nature of the death penalty, proof that "race more likely than not plays a role" is sufficient to demonstrate the unconstitutionality of a death sentence. Likewise, proof that race more likely than not plays a role in the decision of whether to charge a defendant with a capital felony, and, consequently, whether to subject a defendant to death, is sufficient to demonstrate that a sentence of death is disproportionate. "The determination of the significance of [this] evidence is at its core an exercise in human moral judgment, not a mechanical statistical analysis. It must first and foremost be informed by awareness of the fact that death is irrevocable, and that

as a result 'the qualitative difference of death from all other punishments requires a greater degree of scrutiny of the capital sentencing determination.' *California* v. *Ramos*, [463 U.S. 992, 998–99, 103 S. Ct. 3446, 77 L. Ed. 2d 1171 (1983)]. For this reason, we have demanded a uniquely high degree of rationality in imposing the death penalty. A capital sentencing system in which race more likely than not plays a role does not meet this standard. It is true that every nuance of decision cannot be statistically captured, nor can any individual judgment be plumbed with absolute certainty. Yet the fact that we must always act without the illumination of complete knowledge cannot induce paralysis when we confront what is literally an issue of life and death." Id.

Finally, the prevailing justices and the state argue that a prosecutor's decision of whether to pursue the death penalty in other cases is not a relevant factor in determining whether the death sentence is proportionate for the defendant in this case. In making this argument, the prevailing justices and the state seek to insulate prosecutorial discretion from review.[22] As I pointed out in my dissent in *State* v. *Ross*, 230 Conn. 183, 306–307, 646 A.2d 1318 (1994), cert. denied, U.S.    , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995),[23] however, the available statistics "compel the conclusion that prosecutorial discretion has resulted in the arbitrary imposition of the death penalty. Since 1973, there have been at least fifteen cases in Connecticut in which the defendant was initially charged with cap-

---

[22] The state contended during oral argument on this motion that the defendant's proposal is impractical and inefficient: "It's going to start with prosecutorial discretion, and it's going to go from there and include every actor in the chain, including the juries, including the courts, and say that the entire scheme is flawed." Nonetheless, if racism has infected any of the actors or procedures within that chain, a sentence of death is not proportional.

[23] See footnote 4 of this dissent.

ital felony, but was allowed to plead guilty to a lesser crime and avoid the death penalty. This number does not include cases in which the defendant could have been charged with capital felony originally but was not. Four of the fifteen cases were factually similar to the one before us, involving murders committed in the course of a sexual assault or kidnapping." If race indeed plays a role in the exercise of prosecutorial discretion—as the defendant's preliminary data certainly seems to suggest—we surely cannot complete proportionality review without considering this factor.

Indeed, racial discrimination exercised by a prosecutor is no less repugnant than racial discrimination exercised by a fact finder at trial. "[D]iscrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury. The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less important than the jury's. Just like the jury, then, where death is the consequence, the prosecutor's discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. . . . *DeGarmo* v. *Texas*, 474 U.S. 973, 975, 106 S. Ct. 337, 88 L. Ed. 2d 322 (1985) (Brennan, J., dissenting)." (Internal quotation marks omitted.) Id., 307.

In other words, in this case, the mere fact that discrimination in the enforcement of the death penalty may have occurred in the prosecutor's office, rather than in the trial court, is no less of a reason to overturn a criminal defendant's sentence of death. In the past, when confronted with discrimination on the basis of race, we have not hesitated to delve into the prosecutor's motivation. Indeed, this court has demonstrated great concern over the possibility that prosecutorial actions may be linked to racial discrimination. In *State*

v. *Holloway,* 209 Conn. 636, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989), Justice Glass, writing for a unanimous court, declared that this court would go beyond federal constitutional requirements in an effort to stamp out charges of purposeful racial discrimination in a prosecutor's exercise of peremptory jury challenges. Such discrimination, he wrote, "is a matter of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The issue of purposeful racial discrimination in the use of peremptory challenges by the state may arise in any jury trial of a criminal case in which venirepersons of the same cognizable racial group as the defendant are struck from the venire. Consequently, because this issue is of such vital importance to our real and perceived adherence to the rule of law, in the exercise of our inherent supervisory authority over the administration of justice, in all future cases in which the defendant asserts a . . . claim [based on *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)], we deem it appropriate for the [prosecutor] to provide the court with a prima facie case response consistent with the explanatory mandate of *Batson.*" (Citation omitted; internal quotation marks omitted.) Id., 645–46.

Although racial discrimination in the selection of a jury is intolerable, claims of racial discrimination take on even more profound dimensions in cases where, as here, a sentence of death may have been imposed on the basis of race. Accordingly, just as this court requires a prosecutor to provide a prima facie explanation of why he or she exercised a peremptory challenge in a particular manner, so too should this court, when conducting proportionality review, require a prosecutor to provide a prima facie explanation of why he or she failed to prosecute "similar cases" as capital felonies

when the defendant was white, or the victim was African-American.

## III

Death is irrevocable. It is the ultimate penalty that society can impose and, once imposed, cannot be reversed. This court has an undeniable legal and moral obligation to ascertain whether, as the defendant's data suggests, race is at the core of the imposition of the death penalty in Connecticut. We cannot ignore the specter of racism, but must confront it and eradicate it from the administration of justice. Yet three justices of this court, not even a majority, take action that effectively deprives this defendant of an opportunity to demonstrate that race played a role in his sentence of death.

The defendant in this case has produced preliminary data that suggests that in the prosecution of homicide cases in Connecticut, the race of the defendant and the race of the victim play a significant role in determining who is to live and who is to die. The defendant asks this court to allow him to develop the evidentiary underpinnings of such a claim. This issue, having been raised, will continue to cast a dark cloud over the courts and the integrity of our judicial system. We must put it to rest. I would grant the defendant's motion.[24]

[24] I also would refer this matter to a state trial referee to conduct the necessary fact-finding to determine the statistical significance of the data furnished by the defendant and the conclusions that may be drawn therefrom.