******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. I agree with and join Justice Zarella's dissenting opinion, and generally agree with the dissenting opinion of Chief Justice Rogers. Both of those opinions thoroughly explain the myriad flaws in the majority's rationale, and make clear that the majority's conclusion that the passage of No. 12-5 of the 2012 Public Acts (P.A. 12-5) has rendered the death penalty unconstitutional is without basis. I write separately to highlight the majority opinion's apparent disregard of both the people of this state and their elected representatives. The majority's decision ignores the will of the people of Connecticut by abolishing the death penalty in a violation of the separation of powers, and essentially passes an amendment to P.A. 12-5 by a vote of four, abolishing that portion of the act that preserved the penalty of death for the eleven men currently on death row. This type of decision making is reminiscent of the same type of judicial activism that I spoke out against in my dissent in *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 439, 112 A.3d 1 (2015), and, just as in that decision, today's majority decision "reflects a complete misunderstanding of the proper role that this court should play within the rule of law." Id.

This court has developed an apparent practice of exceeding the constitutional bounds of its power in order to impose its personal notion of what justice and fairness require. In *Lapointe*, I expressed my strong disagreement with the majority's decision to abandon our role as an impartial reviewing court by acting as an advocate for the petitioner in that case and by usurping the role of the trial court in defiance of the constitutional limits on our power. Id. I also expressed concern that the decision in *Lapointe* marked a growing tendency by this court to go beyond the great power entrusted to it, a trend that traces its more recent roots to this court's decision in *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161–62, 84 A.3d 840 (2014). *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 452. In *Lapointe*, I questioned whether the clouds cast over this court by its abuse of our supervisory authority in *Blumberg Associates Worldwide, Inc.* and *Lapointe* were not isolated squalls, but portended an approaching storm—one that would wash away any remaining pretense that this court is guided by the rule of law. See id., 440–41.

Today, that perfect storm has arrived. Today's majority continues this court's unwarranted and unconstitutional expansion of its power, this time by usurping the role of our legislature, undermining the rule of the people and *legislating from the bench* in violation of

the separation of powers. Using the guise of a contemporary standards analysis, today's majority tosses aside the moral standards held by the people of this state, as expressed through their legislature and their juries, and it imposes its own beliefs about what punishment should be appropriate for the worst criminal offenders in this state. In effect, the majority elevates itself to the ultimate political branch in our democracy with the power to impose its policies on the people—a result that is especially paradoxical when one considers that none of the members of this court were put here through a popular election. Importantly, however, because the majority opinion has grounded its decision on the conclusion, albeit incorrect, that the death penalty no longer comports with evolving standards of decency, *the legislature has the power to reenact the death penalty*. To be clear, after today's decision, the legislature is free to scrap the prospective repeal or adopt different legislation reinstating or preserving the use of the death penalty in future cases. As the majority acknowledges, legislative enactments are "the clearest and most reliable objective evidence of contemporary values . . . ." *Atkins* v. *Virginia*, 536 U.S. 304, 312, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). As the majority recognizes, there is nothing that requires that the standards of decency evolve only in one direction.

Before I proceed to my analysis, I offer the following observation. The question of whether the state should be able to execute its citizens for committing crimes held by society to be the most egregious entails thorny and essential legal, political, ethical and religious issues. It is unsurprising, therefore, that the death penalty is one of those issues about which people hold strong beliefs. The issue is necessarily entangled with the world view that one holds. Of course, we come to the bench not as automatons, but as persons, with fully developed world views, shaped by our experience and character. I am not suggesting that we must, or even should, leave those experiences at the door when we enter the courtroom. As United States Supreme Court Justice Sonia Sotomayor has eloquently acknowledged, the experience of a Latina jurist brings a different and valuable perspective to judicial decision making. S. Sotomayor, "A Latina Judge's Voice," 13 Berkeley La Raza L. Rev. 87, 91–92 (2002). The same can be said of the various backgrounds of my esteemed colleagues— each of us brings the value of our diverse and individual experiences to the work of the court. At the same time, of course, we are all bound by the rule of law. The line that we must walk as judges, therefore, is a fine one. We bring our individual perspectives to each decision, but our personal world views must yield to the rule of law when the two conflict. It is much more challenging to walk that line when the question is one that engenders the level of passion inspired by the question of capital punishment. The fundamental failure of the

majority is that it has failed to walk the line.

In The Federalist No. 78, Alexander Hamilton described the role of the judiciary in relation to the other branches of government. In his famous essay describing the judiciary as the "least dangerous" of the three branches, Hamilton summarized its role in the following statement: "It may truly be said to have neither **FORCE** nor **WILL**, but merely judgment . . . ." The Federalist No. 78, p. 356 (Alexander Hamilton) (Hallowell: Masters, Smith & Co. 1857). Force lies in the role of the executive; will properly is the function of the legislature. That is, the legislature is the branch of government that properly reflects and carries out the will of the people. The judiciary's role cannot be to reflect the will of the people or the will of individual judges—its role is to apply the rule of law and issue judgment. In the content of today's decision, the majority ignores its proper role and seeks to usurp that of the legislature by carrying out a will—clearly, however, the will that the majority imposes is not the will of the people, but the will of the four unelected justices in the majority.

There is a good reason for Hamilton's view that the role of the judiciary should be one that is restricted to judgment and divorced from will. If the legislators fail to carry out that will, the people have the power to vote them out of office. As the Chief Justice observes in her dissent; see footnote 31 of the Chief Justice's dissenting opinion; at the time that P.A. 12-5 was passed, a Quinnipiac University poll revealed that Connecticut voters supported the death penalty by a huge margin, with 62 percent in favor and only 30 percent opposed. See Quinnipiac University, Release Detail (April 25, 2012), question 20, available at http://www.quinnipiac.edu/news-and-events/Quinnipiac-university-poll/connecticut/release-detail?ReleaseID=1739 (last visited July 16, 2015). I also note that that same 2012 poll revealed that 37 percent of Connecticut voters said that a legislator's death penalty vote would be "[e]xtremely important" or "[v]ery important" to their vote in the upcoming election that year, and that most voters would be less likely to vote for a legislator who had voted to abolish the death penalty. See id., question 26. Obviously, the legislators who enacted P.A. 12-5 realized that popular support for abolishing the death penalty simply did not exist, hence the *partial* repeal. No such check exists for this court. The four justices in the majority do not need to answer to the voters for their decision to dismiss the will of the people, and impose the majority's will on them.

The judicial power of interpretation is one of this court's greatest powers. As United States Supreme Court Chief Justice John Marshall explained, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803). We

say what the law means. That is undeniably a great power. It is not, however, a power without limits. Although we interpret it, we do not make the law—*that* function, as explained by Hamilton in The Federalist No. 78, is emphatically the province of the *legislature*. The Federalist No. 78, supra, p. 356.

The line between interpretation and legislation is the reason that, when a dispute brought to this court requires us to determine the constitutionality of an act by another branch of government, we must proceed cautiously; our forays into constitutional questions must give due respect to the decisions of our coordinate branches of government. Our analysis of the constitutionality of a law, accordingly, begins with the strong presumption that the law is valid. *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155, 957 A.2d 407 (2008). This presumption is dispositive unless and until the party challenging the act shows beyond a reasonable doubt that it violates the mandates in our constitution. Id. We must indulge in every presumption in favor of sustaining its validity and we may not disregard a challenged act unless its invalidity is clear. *State* v. *Matos*, 240 Conn. 743, 748, 694 A.2d 775 (1997). If there is any reasonable doubt about whether a challenged act violates our constitution, we must uphold its validity and apply it to the case before us. See id.

To be sure, we do not submit entirely to the legislature when considering whether a punishment is cruel and unusual, and we must review the validity of the challenged punishment in light of contemporary standards of decency. *State* v. *Rizzo*, 303 Conn. 71, 197, 31 A.3d 1094 (2011), cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012). The standards of decency that we must consider, however, are those of the people of this state, not the judges of this court; our constitution does not give us a license to impose our *own* conceptions of decency on the people. Our cases recognize, as they must, that the legislature's judgments are the "clearest and most reliable objective evidence of contemporary values . . . ." (Internal quotation marks omitted.) Id., 191. Shaping our society's response to such a mutable problem as crime is quintessentially a legislative function, so our constitution properly "assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment . . . ." *State* v. *Darden*, 171 Conn. 677, 679–80, 372 A.2d 99 (1976).

The democratically elected legislature is far better suited to evaluate and give effect to the social and moral choices of our people than a group of appointed judges who are largely insulated from public contact and scrutiny. Reasonable people may disagree about the wisdom of using capital punishment, and "the value of [that sanction], and its contribution to acceptable penological goals, typically is a complex factual issue" primarily

for the legislature to resolve. (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 197. We must, therefore, exercise our constitutional duty with " 'great restraint' " and may interfere with the democratic process only when there are compelling reasons to conclude that our criminal statutes are far out of step with contemporary mores. Id.

Of course, because there are no such compelling reasons to cast aside the legislature's recent decision to retain capital punishment for certain offenders, as demonstrated by the opinions of the Chief Justice and Justice Zarella, the majority applies nothing resembling this deferential framework. In the majority's view, the issue is simple. Despite indicators that capital punishment remains a decent and deserved form of punishment for certain offenders, including those already under a capital sentence, the majority's own extra-record fact-finding leads it to an extraordinary and inflammatory conclusion, that those who support capital punishment are, at best, *enemies* of modern decency. Specifically, the majority cites approvingly to a report that states that "executions are overwhelmingly confined to the South (and states bordering the South), the very same jurisdictions that were last to abandon slavery and segregation, and that were most resistant to the federal enforcement of civil rights norms." C. Steiker & J. Steiker, Report to the American Law Institute Concerning Capital Punishment, in A.L.I., Report of the Council to the Membership of The American Law Institute on the Matter of the Death Penalty (April 15, 2009) annex B, p. 29; see footnote 86 of the majority opinion. In this single statement, the majority suggests that Southerners are *racists*, and so are those who support the death penalty. Painting Southerners and supporters of the death penalty with the broad brush of racism could appear to some to be racist itself and reinforces stereotypes that have no foundation in fact or law. It is one thing to read about racism and believe that one understands it; it is an entirely different matter to live through it.

Indeed, the majority's insinuations about the moral values of those citizens in this state and elsewhere who continue to support capital punishment not only inappropriately stereotype those who support the death penalty, but they also miss the point that evaluating the current standards of decency is a complex task that cannot be accomplished by way of sweeping generalizations. The most that can be said in favor of finding capital punishment to be unconstitutionally cruel is that contemporary sentiment on the topic is mixed. Although there are citizens in our state who oppose capital punishment, there are certainly many fair-minded citizens who find it to be an appropriate punishment, at least for certain offenders, a sentiment reflected in the very recent judgment of our legislature and the decisions of our juries. Given the lack of any

real consensus on the matter, this would be a fitting issue to leave to the people to resolve, at least until a consensus on contemporary standards truly arises.

Rather than acknowledging that contemporary standards are mixed, the majority scours the legislative record and extra-record materials to suggest that there is a statewide consensus that the death penalty does not comport with standards of decency. The majority's decision to exceed this court's limited power appears to be designed to eliminate capital punishment in this state. Rather than faithfully applying a true contemporary standards analysis, the majority applies only the appearance of such an analysis, selecting for consideration only those aspects of each factor that support its conclusion.

The majority also flouts the limits imposed by our constitution, engages in fact-finding limited to discovering only those facts supporting its conclusion, and ignores the import of facts that do not support its view. At every step in its analysis, the majority's selective review of the facts leads it to deliberately choose an explanation that undermines, rather than supports, the validity of the legislature's judgment that capital punishment remains a valid and appropriate punishment for those who committed their crimes prior to the enactment of P.A. 12-5. As the Chief Justice points out, the majority relies on floor speeches by a handful of legislators during the debate on P.A. 12-5 to find a legislative consensus that capital punishment is immoral, but gives short shrift to the legislature's ultimate and deliberate decision to *retain* capital punishment for certain offenders.

In reviewing actual sentencing practices, the majority cites a few misleading statistics from an extra-record source to find that our juries are reluctant to impose the death penalty, but the majority's selective quotation of figures ignores the impact of other factors affecting the ratio of capital sentences, such as plea agreements and acquittals, and does not mention that our juries ultimately imposed a capital sentence in 43 percent of the cases presenting that option. J. Donohue, "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?," 11 J. Empirical Legal Stud. 637, 641 (2014). The majority's extra-record fact-finding also leads it to conclude that the lengthy delay between sentencing and punishment results from society's moral rejection of capital punishment, a conclusion that ignores that the cause of this delay is not a state loath to carry out a duly imposed sentence, but the robust appeal process that the defendants themselves use to challenge their sentences.

Most tellingly, in concluding that the death penalty no longer comports with contemporary standards of decency, the majority gives no consideration to the fact

that a Connecticut jury recently handed down a capital sentence in the only capital sentencing hearing to take place *after* the enactment of P.A. 12-5. Richard Roszkowski was convicted of murdering three people in 2006, before the effective date of P.A. 12-5. The victims included nine year old Kylie Flannery, her mother, Holly Flannery, and Thomas Gaudet. In March, 2014, nearly two years after P.A. 12-5 took effect, a jury of Roszkowski's peers determined that his crimes warranted society's ultimate punishment. *State* v. *Roszkowski*, Superior Court, judicial district of Fairfield, Docket No. FBT-CR-06-0218479-T. They did this despite the knowledge that the state had repealed the death penalty for later committed crimes. One juror was quoted as saying: " 'He deserved to be punished to the full extent of the law of the land at the time. And at that time, it was death.' " A. Griffin, "New Death Sentence: Killer Exempt from Execution Ban," Hartford Courant, May 23, 2014, pp. A1, A5. The majority relegates this crucial information to a brief footnote in its lengthy decision. See footnote 102 of the majority opinion.

The majority decision is replete with ironies that are so extreme that they reveal the lack of any rational basis for the opinion. The majority somehow extracts a public consensus in favor of prohibiting capital punishment from a lack of public support for such a repeal. It concludes that our juries despise capital punishment, despite a willingness to impose a death sentence in nearly one half of the cases that presented such an option. And, the majority reasons, providing defendants with a robust and sometimes lengthy process to ensure the fairness of their convictions and sentences renders those sentences unconstitutionally cruel, essentially allowing those sentenced to death to render their own sentences invalid.

In deciding that a prospective repeal demonstrates a consensus against capital punishment, the majority ignores our recent observation in *Rizzo* rejecting the notion that a prospective repeal indicates a legislative judgment that the death penalty "is intolerable under any and all circumstances" and, instead, reflects a choice between valid modes of punishment. *State* v. *Rizzo*, supra, 303 Conn. 190 n.88. Similarly, the majority's position that the narrowing of the offenses for which the death penalty is available supports a conclusion that capital punishment is unconstitutional directly conflicts with our decision in *Rizzo*. Specifically, in *Rizzo*, this court acknowledged that refinements to the application of capital sentences may not indicate a fundamental disapproval of the death penalty, but are consistent with the principle that society's ultimate sanction ought to be used sparingly. Id., 189.

Equally problematic is the concurring opinion, which, in a highly unusual move, is coauthored by Justices Norcott and McDonald.[1] The concurring justices have

taken it upon themselves to decide whether our capital punishment system suffers from racial bias—an issue that is both unnecessary and improper to address in this appeal. This issue is not before us in the present appeal, we do not have a proper factual record to decide it, and the issue is presently pending in another, separate appeal before this court that *does* have a proper factual record. See *In re Death Penalty Disparity Claims*, Connecticut Supreme Court, Docket No. SC 19252 (filed November 6, 2013).

I observe that, because the concurring opinion addresses the issues presented in the pending appeal before this court in *In re Death Penalty Disparity Claims*, supra, Docket No. SC 19252, Justice Norcott's participation raises questions about the scope of this court's decision in *Honulik* v. *Greenwich*, 293 Conn. 641, 663, 980 A.2d 845 (2009). General Statutes § 51-198 (c)[2] and *Honulik* contemplate that a judge may continue to wrap up the cases he had been working on before he attained the age of seventy, including hearing timely motions to reconsider. Accordingly, Justice Norcott's participation in this appeal is authorized by § 51-198 (c) as interpreted by *Honulik*, because he had not attained the age of seventy when the motion to reconsider was argued to this court. Currently, however, Justice Norcott is serving as a judge trial referee and, therefore, would be unable to participate in the resolution of the pending appeal in *In re Death Penalty Disparity Claims*, supra. Yet, by coauthoring the concurrence, he weighs in on the issues presented in the pending appeal, thus expressing his opinion on an appeal in which he would not otherwise be authorized to participate.

The possibility that a justice who already has attained the age of seventy—in the context of an appeal in which, I reiterate, his participation is authorized by § 51-198 (c) and *Honulik*—would be discussing in a judicial opinion the evidence and issues presented in an appeal that is still pending after that justice attained the age of seventy, could not have been contemplated or foreseen by *Honulik*. In light of the concurring opinion's discussion of the issues and evidence presented in *In re Death Penalty Disparity Claims*, supra, Docket No. SC 19252, the legislature may want to consider clarifying the parameters of § 51-198 (c).

By way of clarification, I do not criticize Justice Norcott for reiterating his well-known concerns about racial bias in the imposition of the death penalty. I have the utmost respect for Justice Norcott's courageous and steadfast adherence to his personal beliefs over the past twenty-three years, and nothing in this dissent should be construed to impugn his integrity. My concerns regarding the questions raised about the scope of *Honulik* are limited to the concurring opinion's discussion of the issues and evidence presented in a pend-

ing appeal.

Moreover, the concurring justices lack an adequate factual record to decide this issue. The record in the present appeal is devoid of these facts because we made clear, time and again, that any claims alleging racial disparity in capital sentencing must be heard in the consolidated habeas litigation styled *In re Death Penalty Disparity Claims*, Superior Court, judicial district of Tolland, Docket No. TSR-CV-05-4000632-S. See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 233–34, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Breton*, 264 Conn. 327, 406–407, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); *State* v. *Cobb*, 251 Conn. 285, 498–99, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Cobb*, 234 Conn. 735, 761–62, 663 A.2d 948 (1995). That case has now been decided by the habeas court and is presently pending on appeal before this court. See *In re Death Penalty Disparity Claims*, supra, Docket No. SC 19252. The concurring justices acknowledge that they cannot rely on the *findings* of the habeas court in that case—that would plainly be improper— but they nevertheless discuss the issues presented in the habeas proceeding, and rely heavily on the opinion of John J. Donohue III, the expert who testified on behalf of the petitioners in *In re Death Penalty Disparity Claims*, supra, Superior Court, Docket No. TSR-CV-05-4000632-S. The habeas court, in its memorandum of decision denying the petition, did not credit Donohue's opinion because the court found it lacking when subjected to an analysis pursuant to the test set forth in *McCleskey* v. *Kemp*, 481 U.S. 279, 292, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), which requires proof of purposeful discrimination in the case at hand. See *In re Death Penalty Disparity Claims*, supra, Superior Court, Docket No. TSR-CV-05-4000632-S (October 11, 2013) (unpublished opinion). The court also found Donohue's opinion to "fall short," however, even under the broader test advocated by the petitioners, who relied on a more general demonstration of racial disparity in the imposition of the state's capital punishment scheme to challenge their sentences. Id. The fundamental weakness in Donohue's testimony, the court found, was that it failed to demonstrate that "the disparities shown by [his] analysis [were] the *product* of Connecticut's capital punishment procedure and not merely a reflection of ambient social or psychological forces." (Emphasis in original.) Id.

The concurring justices state: "We strongly emphasize that the fact that a charging or sentencing decision may be based in part on impermissible racial factors does not imply that the prosecutor, judge, or juror making that decision is 'racist,' as that term is typically used." The concurrence claims that it relies on the phenomenon that "most, if not all, of us exhibit unconscious

or implicit bias." I offer two observations. First, by failing to define racism, the concurring justices free themselves simultaneously, on the one hand, to claim that those who support the death penalty or are part of a system that imposes it are racist, and, on the other hand, to disavow that claim by stating that they are instead referring to "unconscious" bias. Second, the concurring justices fail to draw any distinction between the *feelings* of unconscious bias that prosecutors, police officers, judges and juries may have, and the *actions* that are undertaken and the *decisions* that are made in the imposition of the death penalty. What reviewing courts should be concerned with in the imposition of the death penalty are racist acts, not racist feelings.

I agree with the concurring justices that unconscious racial bias in our society is a powerful, negative force. It is this type of racial bias that permeates the daily lives of every person of color, lying under the surface, unspoken and unacknowledged, rendered more powerful by its invisible omnipresence in every exchange. This type of racial bias is the reason that the achievements, contributions and opinions of persons of color are devalued and dismissed. It is the source of the stereotypes with which persons of color are encumbered, and the means by which those stereotypes are reinforced. The concurring opinion, and apparently also the majority, rely on these tendencies of racism and bias to suggest that in their view the death penalty is always motivated by bias and racism. Those tendencies, however, can be said to be present in the imposition of *any* criminal punishment, not only the death penalty. Following the logic of the concurring justices, we should therefore ban all criminal punishment, since it cannot be imposed in a racially neutral manner.[3] Because the parties to the present appeal did not raise any claims of racial bias, there is no need for the concurring justices to address that issue. But the concurring justices address it anyway, claiming that, because of the result reached in the majority opinion, they must review the issue of racial bias now or else they will never have a chance to speak on it. While it is true that a concurring opinion is not binding authority, no one familiar with the persuasive force of many of the concurring opinions authored by United States Supreme Court Justice Sandra Day O'Connor can deny that concurring opinions have some precedential value. See generally D. Lowenthal & B. Palmer, "Justice Sandra Day O'Connor: The World's Most Powerful Jurist?," 4 U. Md. L.J. of Race, Religion, Gender & Class 211 (2004). With that precedential value comes responsibility. In a concurring and dissenting opinion in *State* v. *Santiago*, 305 Conn. 101, 325–26, 49 A.2d 566 (2012), Justice Harper referred to a statistical study of capital punishment prepared by Donohue, the expert who testified on behalf of the petitioners in the then ongoing habeas

corpus proceeding, *In re Death Penalty Disparity Claims*, supra, Superior Court, Docket No. TSR-CV-05-4000632-S. Justice Harper, however, in a replacement page to his concurring and dissenting opinion, added a footnote, in which he properly recognized that the study by Donohue "was prepared in connection with" *In re Death Penalty Disparity Claims*, supra, Superior Court, Docket No. TSR-CV-05-4000632-S. *State* v. *Santiago*, supra, 325 n.11. Accordingly, he noted the necessary limitations of his reference to that study: "I . . . point to this study not for the ultimate truth of its assertions but as a provocation to critical inquiry. I leave it to the course of judicial process to pass definitive judgment on the soundness of the study's data and its ultimate conclusions regarding the impact of race on the death penalty in Connecticut." Id. (*Harper, J.*, concurring in part and dissenting in part). Accordingly, the rule precluding a judge from commenting on the issues presented in a pending appeal is not limited to remarks made in a majority opinion, but applies with equal force to remarks made in a concurring opinion. This limitation accommodates concurring opinions' potential precedential value, despite their nonbinding nature.

Today's decision is ultimately about disrespect. It is about disrespect for the limits placed on this court's power, disrespect for the judgment of the people expressed through their juries and their legislature, and disrespect for the value of carrying out punishments deemed warranted by juries and the people's legislature. By concluding that capital punishment is unconstitutional, the majority decides that the legislature must have acted improperly when it deliberately chose to retain capital punishment for certain offenders. The majority casts aside the limits on our power and the respect owed to our coequal branches of government and unilaterally removes this issue from the public debate and negates the legislature's decision to retain the death penalty for the eleven men on death row.

The majority's decision renders irrelevant the effort of our jurors who had to endure difficult testimony and render perhaps one of the most difficult decisions of their lives. By tossing aside the sentences reached by these jurors, and the people's judgment that these sentences ought to be carried out, the majority shows disrespect for the difficulties endured by the families of the victims of those under capital sentence, and deprives the victims' families of the predictability of the rule of law.

The eleven men currently on death row represent what the people consider to be the worst of our society, and the people of Connecticut decided that they should die for their crimes. The four justices of the majority today subvert the will of the people of this state, which was, both before and after the passage of P.A. 12-5, that these eleven men should die for their actions. And what

they did matters. The monstrosities that they committed demonstrate the absurdity of the majority's suggestion that "the population of death row has been chosen on grounds other than the atrocity of the offenders' crimes . . . ." I provide a recounting of the brutal offenses committed by some of the prisoners on death row to serve as a reminder of the horrific crimes that the people of Connecticut have deemed worthy of execution.

In the middle of the night, after spending the evening drinking and dancing with a woman he met at a bar in Waterbury, Robert Breton entered the apartment of his former wife, JoAnn Breton (JoAnn), who had recently divorced him. *State* v. *Breton*, supra, 235 Conn. 212. Breton went into JoAnn's bedroom while she was sleeping, and beat and stabbed her repeatedly. Id., 212–13. She tried to escape, but barely managed to make it across the room before Breton caught her and continued stabbing her in the face, chest and neck. Id. He finally plunged the five inch blade through her neck, severing her carotid artery, then left her to bleed to death. Id. In the meantime, Breton's teenage son, Robert Breton, Jr. (Robert, Jr.), had been sleeping in his bedroom when he was awakened by his mother's screams for help. Id., 213. Robert, Jr., tried to come to his mother's aid, but Breton attacked him, slashing him in the forearm with the knife, and cutting him on his hands and fingers. Robert, Jr., tried to escape, running and bleeding down the stairs. He made it to the first floor landing, but then his father caught up with him. Id. Breton repeatedly stabbed his son in the face, chest, shoulder and neck, finally killing Robert, Jr., in the same way that he had killed his mother, burying the blade deeply in his son's neck. Id.

Daniel Webb abducted Diane Gellenbeck[4] at gunpoint in the parking garage at her workplace in Hartford. *State* v. *Webb*, supra, 238 Conn. 397–98. He forced her into the car he was using and drove to Keney Park. Id., 398. Once there, he forced her to remove her shoes, pantyhose and panties, and then attempted to rape her. She struggled, scratching his face and ripping her clothing in the process. Id. When she managed to break free, he shot her twice in the back. Id. She collapsed, falling to the ground. As Gellenbeck was crawling away from the defendant and crying for help as she coughed up blood, he retrieved the car and drove it back to where she was crawling. Id. He got out of the car. He walked over. He came to where she had crawled, in excruciating pain, thirty-three yards from where she first fell. He stood in front of her. Id., 398, 486. He then fired two more shots at her—in the chest and in the ear. Finally, he bent down and held the gun close to her skin—and he shot her in the face. Id., 398, 487. With the last shot, Webb held the gun so close to her that her face was stippled from the hot gunpowder. Id., 398. At least two of the bullets that were removed from Gellenbeck's body possessed hollow points, "designed to expand

upon contact and cause greater damage to their target than ordinary bullets." Id., 399.

While twenty-two year old Julia Ashe was shopping in the Bradlees shopping center in Waterbury, Sedrick Cobb deflated one of her car tires, and then waited for her to return to her vehicle. *State* v. *Cobb*, supra, 251 Conn. 302, 318. He had already unsuccessfully tried this ruse with two other potential victims, who were luckier than Ashe. Id., 301–302. Ashe was not so lucky. When she returned to her car with her purchases, he offered to change her tire for her, an offer that she accepted. Id., 302. Having gained her trust, Cobb claimed that his car was disabled and asked for a ride. Id. Ashe agreed, and while she was driving, Cobb forced her to drive to a nearby but secluded area, where there was a dam that abutted a pond. Id. Once there, he ordered her to move to the backseat of the two door car, so she could not escape. Id. He began to go through her handbag and shopping bags, taking money and her personal papers. Id., 302–303. He next moved to the backseat and pulled down her pants, inserted his finger in her anus, then raped her vaginally. Id., 303. He jammed one of her gloves in her mouth, then covered her mouth and nose with fiberglass reinforced tape that he had brought with him. Id., 302–303. He also used the tape to bind her hands and her feet. He carried her to the edge of the dam, where there was a twenty-three foot drop to the concrete below, covered by about one foot of water. Id., 303. He pushed her off the top of the dam, but he did not leave. He stayed and watched from his vantage point at the top of the dam to be certain that she had died from the fall. Id. Ashe survived the fall and used some wire mesh to remove the tape from her hands, cutting herself in the process. She also managed to remove the tape from her feet, but she could not remove it from her face, although she gouged her face with her fingernails trying. She then began to crawl out of the water onto the shore. Id. In the meantime, seeing that she was still alive, Cobb went down to the bottom of the dam, dragged Ashe back to the water, then forced her facedown into the water, drowning, strangling her, or both. Id., 303–304.

Richard Reynolds, a convicted drug dealer and member of a cocaine trafficking organization in Waterbury, hit the streets before 4 a.m. on the morning of December 18, 1992, with a .38 caliber pistol in his right coat pocket and cocaine in his left pocket. *State* v. *Reynolds*, supra, 264 Conn. 18–19. Thirty-four year old Officer Walter Williams of the Waterbury Police Department, who was on patrol alone that morning, noticed Reynolds and his companion, and ordered them to " '[g]et up against' " Williams' cruiser. Id., 15, 19, 169 n.153. Reynolds partially complied and placed his left hand on the hood of the cruiser, but kept his right hand in the pocket of his coat, where his gun lay, hidden. Id., 19. Reynolds refused to remove his right hand from the coat pocket despite

Williams' repeated instructions to do so. Id. Williams grabbed Reynolds' right arm, but could not force his hand out of the pocket. Id., 19–20. As Williams released his hold on Reynolds' right arm, Reynolds removed his left hand from the hood of the cruiser and his elbow bumped Williams in the chest. Id. Reynolds could feel the officer's bulletproof vest under his uniform when his elbow made contact. Id. Knowing that Williams' body was protected, Reynolds made his decision. He whipped around, removed his gun from his coat pocket and aimed at the young officer's head, shooting Williams behind the left ear. Id. Reynolds ran, firing three to six more shots toward Williams as he raced away. Id. He left Williams to die in the road. Williams was still alive when a passerby came by shortly thereafter. He told the man that he had been hit, then became unintelligible. Id., 21. His body began to shake uncontrollably. Id. The passerby radioed for help, and Williams was still alive when officers arrived at the scene. He reached out and grasped the shoulder of Officer Timothy Jackson, who had knelt down beside him. He tried to speak, but could not. Id. When he arrived at the hospital he was unconscious, and, soon after, he lapsed into a coma. He died that day from the gunshot wound to his head. Id.

Stanley G. Edwards (Stanley) was thirteen years old when Todd Rizzo brutally murdered him on September 30, 1997, because Rizzo, who had been fascinated with serial killings in general and Jeffrey Dahmer in particular, "wanted to know what it was like to kill somebody." *State* v. *Rizzo*, 266 Conn. 171, 179, 186, 190, 191, 833 A.2d 363 (2003). Earlier that day, Stanley had been playing with friends. Id., 186. After dinner with his mother and his sister, he went for a ride on his bicycle. Id. As Stanley rode past Rizzo's house at approximately 8 p.m., Rizzo, who knew Stanley, was just walking to his car in front of his home. Stanley rode up to Rizzo, who asked him if his mother or anyone else knew that Stanley was there. When Stanley responded that no one knew, Rizzo decided to kill him " 'for no good reason and get away with it.' " Id., 187. In order to lure the boy to his backyard, Rizzo told Stanley that he could show him some snakes. Id. As Stanley waited, Rizzo retrieved a flashlight from his car and he also picked up a three pound sledgehammer that he had hidden there. Id. He hid the sledgehammer down the front of his pants, and gave Stanley the flashlight. Id. While Stanley was using the flashlight to look for snakes in the backyard, Rizzo approached him from behind and held the sledgehammer high, then brought it crashing down into the side of Stanley's head. Id. Stanley fell forward on his face, rolling over when Rizzo missed with his second swing, begging for his life. Id. Rizzo responded by straddling Stanley " 'like a horse' " from behind, raining blow after blow down on him, because he did not want the neighbors to hear Stanley scream. Id., 187–88. Stanley tried to defend himself, attempting to shield his head with

his hands, but to no avail. After eleven or twelve blows, Stanley began to gurgle. Id., 188. Rizzo bashed him two more times to be certain that he was dead. Id. Finally, Rizzo stomped on Stanley's back, leaving the imprint of his boot. Id. Rizzo unceremoniously dumped the body onto the pavement in a nearby condominium complex. Id., 189.[5]

In the present case, the defendant, Eduardo Santiago, shot and killed Joseph Niwinski with a rifle in exchange for a used snowmobile. *State* v. *Santiago*, supra, 305 Conn. 114, 121, 123. Before killing the victim, Santiago and his two accomplices cased Niwinski's home several times as part of their preparation for the murder. Id., 122. In addition, they made a homemade silencer for the rifle, and Santiago hand carved the name "JOE" on the bullets. Id. On the night of the murder, Santiago coolly walked up the stairs to Niwinski's apartment, made certain that the alarm in the apartment had not been set, then shot the sleeping man in the head. Id., 123. Santiago then stole a handgun and $200 from Niwinski's apartment but he delayed his exit when he heard an automobile pull up and sound its horn outside the apartment, and Niwinski's landline and cell phone began to ring. Id. After the car drove away, Santiago left. Id. The next night, Santiago asked the man who had hired him to kill Niwinski, Marc Pascual, when the snowmobile would be ready. Id., 124. He was arrested for the murder before he could collect his payment. Id., 125.

Because of today's decision, the families of the victims of these vicious crimes will never have the opportunity to have their voices heard on the subject of whether the punishment of death does not comport with contemporary standards of decency, as they would have, if the *actual* legislature had abolished the death penalty. Their voices, and the voices of the people of Connecticut, already had been heard by the legislature, and the result was P.A. 12-5, which retained the penalty of death for the men already on death row. What message do we send to the people of Connecticut when we ignore the reasoned judgment of their elected representatives and substitute our own judgment instead? What message do we send to the people of this state when we ignore the verdicts of their juries? Today's decision replaces the rule of law with the rule of four. This is not judging. This is not the rule of law.

We are here as arbiters to resolve disputes, not to dictate policy. When determining the scope of our protections from cruel and unusual punishment, we should be guided by the contemporary standards of the community, standards recently expressed in P.A. 12-5, which reflected a decision *not* to completely abolish capital punishment. We could have reaffirmed the magnificence of our democracy by respecting the limits the people placed on our power and by recognizing that contemporary standards demonstrate that this debate

was still in the hands of the people to settle. It is certainly less dramatic to adhere to the decidedly unromantic role assigned to this court of "merely judg[ing]"; see The Federalist No. 78, supra, p. 356; but we are not here for drama or glory. We are not here to sweep away entire statutory schemes with the stroke of a pen by amending public acts from the bench. We are here to perform the much smaller, yet essential role assigned to us as a part of this democracy—we are here to judge. The result of the majority's circumlocution is that four unelected judges are overruling the judgment of the people's legislature despite recent and strong evidence that the people continue to support capital punishment as a penalty that comports with contemporary standards of decency, at least for those offenders who committed their crimes when capital punishment was on the books. What picture does this paint for our citizens if their legislature passes a law permitting a punishment that is consistent with the standard held by the people, and this court overrules their decision and imposes its own standard?

Finally, and most importantly, although the majority's decision improperly substitutes its own judgment for that of the people and their elected representatives, today's decision does not strike a dagger into the heart of the death penalty. Rather, it should be understood as an opportunity for the legislature to review and consider, in light of the majority decision, as well as the current views of the people of Connecticut, especially those of the families of the victims of the atrocious crimes committed by the eleven men on death row, whether the death penalty comports with contemporary standards of decency in this state.

Accordingly, I dissent.

[1] All references to the concurring justices in this dissenting opinion are to Justices Norcott and McDonald only, and references to the concurrence or the concurring opinion are to the opinion coauthored by Justices Norcott and McDonald.

[2] General Statutes § 51-198 (c) provides: "A judge of the Supreme Court who has attained the age of seventy years may continue to deliberate and participate in all matters concerning the disposition of any case which the judge heard prior to attaining said age, until such time as the decision in any such case is officially released. The judge may also participate in the deliberation of a motion for reconsideration in such case if such motion is filed within ten days of the official release of such decision."

[3] With respect to the gratuitous legal advice offered by the concurring justices to the prisoners on death row, transparently couched in a speculation that the prisoners "will likely withdraw any pending penalty phase appeals and habeas claims, and move for a correction of their sentences," I merely observe that today's decision does not prevent this court from revisiting this issue in other appeals that raise the issue of the validity of the death penalty under our state constitution, including the appeal in *State* v. *Peeler*, Connecticut Supreme Court, Docket No. SC 18125 (filed February 26, 2008), in which this very issue is raised and briefed.

[4] See *State* v. *Webb*, Conn. Supreme Court Records & Briefs, October/November Term, 1995, Pt. 8A, Record p. 9.

[5] Because the pending appeals of Jessie Campbell; *State* v. *Campbell*, Connecticut Supreme Court, Docket No. SC 18072 (filed November 26, 2007); Russell Peeler; *State* v. *Peeler*, Connecticut Supreme Court, Docket No. SC 18125 (filed February 26, 2008); Lazale Ashby; *State* v. *Ashby*, Connecticut Supreme Court, Docket No. SC 18190 (filed July 14, 2008); Steven Hayes;

*State* v. *Hayes*, Connecticut Supreme Court, Docket No. SC 18782 (filed April 15, 2011); Joshua Komisarjevsky; *State* v. *Komisarjevsky*, Connecticut Supreme Court, Docket No. SC 18973 (filed May 22, 2012); and Richard Roszkowski; *State* v. *Roszkowski*, Connecticut Supreme Court, Docket No. SC 19370 (filed August 26, 2014); have not yet been heard and/or decided by this court, I do not recite the facts of those cases.

_____